**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**John Martin NIVER, Wayelon Howard
Penland and Stanley Charles McCune,
Defendants-Appellants.**

**No. 81–1429.**

United States Court of Appeals,
Fifth Circuit.

Oct. 5, 1982.

---

William M. Ravkind, Dallas, Tex., for Niver.

Edward A. Mallett, Joseph Gary Trichter, Houston, Tex., for Penland.

Gerald H. Goldstein, San Antonio, Tex., for McCune.

Jimmy L. Tallant, Asst. U. S. Atty., Ft. Worth, Tex., for United States.

Before CLARK, Chief Judge, POLITZ and RANDALL, Circuit Judges.

RANDALL, Circuit Judge:

Defendants, Stanley R. McCune, Wayelon Howard Penland and John Martin Niver,

were charged in a four count indictment with (1) conspiracy to possess marijuana with the intent to distribute it in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 846; (2) unlawful importation of marijuana in violation of 21 U.S.C. §§ 952(a), 960, and 18 U.S.C. § 2; (3) possession of marijuana with the intent to distribute it in violation of 21 U.S.C. § 841(a)(1), and 18 U.S.C. § 2; and (4) displaying aircraft marks that were false and misleading as to registration of the aircraft in violation of 49 U.S.C. § 1472(b) and 18 U.S.C. § 2. The case was tried before the court on stipulated facts on June 27, 1981, and the three defendants were found guilty on all four counts.

The defendants were sentenced to concurrent terms of confinement on the first two counts, two years on each count for McCune and Niver, and one year on each count for Penland. All three defendants were sentenced to concurrent terms of three years' probation on counts three and four, to run consecutively, commencing upon release from confinement for the sentences imposed on counts one and two. Fines were assessed on each of the first three counts totaling $10,000 per defendant. All defendants are free on bail pending appeal.

On appeal, defendants contend that the district court erred in denying their motion to suppress evidence discovered during the allegedly unlawful search and seizure of their aircraft and packages. They would also have us reverse their convictions on the grounds that the prosecution failed to prove the offenses charged. For the reasons stated below, we affirm the denial of the motion to suppress, as well as the convictions of defendants McCune and Penland on all four counts. Defendant Niver's conviction on the fourth count is vacated without prejudice and his other convictions affirmed.

## I. THE FACTS.

On February 9, 1981 at approximately 1:00 a.m., Customs pilot, Oscar J. Vera, was flying a United States Customs aircraft on a radar patrol over Galveston Island, Texas, when he received a radio communication from Houston Center, a Federal Aviation Administration (F.A.A.) ground facility, that an aircraft had been detected approximately seventy miles south of the Galveston Island shoreline. The unidentified aircraft was flying north toward the United States. Houston Center advised Vera that the aircraft did not have a flight plan and that it was not emitting any transponder signal. Vera testified that such a signal would have enhanced the radar image by displaying a specific code, giving an additional twenty to thirty miles of coverage.

Houston Center directed Vera to within two miles of the aircraft. Vera caught up with the plane approximately fifteen miles south of Galveston Island. At the time, Agent Vera was flying at 7500 feet, while the unidentified aircraft was flying in fog which extended from ground level up to approximately 2000 or 3000 feet. The plane was not displaying navigation lights, and could not be seen in the dense fog. No one in the aircraft made the required radio contact with a proper ground facility before penetrating the Air Defense Identification Zone.

The aircraft was flying on a route commonly used by aircraft flying to the United States from Central or South America. The plane entered the United States west of Galveston, Texas, made a circling maneuver, then proceeded toward Sugarland, Texas. As the aircraft approached the Don Hull Airport at Sugarland, its speed slowed from approximately 140 knots to approximately 110 knots as though it were attempting to land. However, the limited visibility caused by dense surface fog would not permit a landing.

The unidentified aircraft then proceeded north-northwesterly in the direction of Bellville, Texas, followed by the Customs plane. The aircraft did not make radio communications with a ground facility as it passed through the Houston area, nor did its transponder or navigation lights become operational. The aircraft flew to a spot near Bellville, then headed west. Landing at Bellville was apparently also foreclosed

524

since the visibility at Bellville was zero due to the fog. Houston Center lost radar contact with the plane approximately seven miles west of Bellville.

Another F.A.A. facility, Austin Approach, made radar contact with an unidentified aircraft approximately fifteen to twenty minutes later. The area where this aircraft appeared on the Austin Approach radar was consistent with the likely position of the aircraft which disappeared from the Houston Center radar, judging by its earlier speed and direction of flight. The unidentified aircraft proceeded towards Austin, Texas, circled the area, lined upon the final approach at the airport, then abruptly turned and headed westbound from the Austin area. There were no radio communications between the unidentified aircraft and an F.A.A. ground facility during its maneuvers in the Austin area. The aircraft circled some small airports west of Austin, then proceeded to a point approximately seven miles west-northwest of Llano, Texas, where it again circled as though attempting to land. The visibility in the Llano area was extremely poor.

Once again radar contact was lost for approximately fifteen to twenty minutes. Houston Center began tracking a target near Mason, Texas, a city approximately forty miles west of Llano and approximately 100 miles southeast of San Angelo, Texas. The unidentified aircraft was again lost on radar at about 3:45 a. m. While the aircraft was maneuvering in the Llano-Mason area, the Customs aircraft was notified that an Airman Advisory for dense fog existed throughout the Southwest-South Central Texas area and only two general aviation airports in central Texas were open, San Angelo and Waco. The government craft was low on fuel and Vera speculated that there was one unidentified target and that it was also either low on fuel or had mechanical trouble. He based his hy-

pothesis on the several attempts to land that had been reported in sequence, regarding slow, low flying aircraft that had not responded to radio signals.[1] Vera headed directly toward Mathis Field in San Angelo, and landed at about 4:30 a. m. While en route to San Angelo, Agent Vera alerted Fort Worth Center (Fort Worth, Texas) and the San Angelo Tower to be on the lookout for the unidentified aircraft and requested that Sheriff's deputies be at Mathis Field to give the agents assistance.

Radar contact with an unidentified aircraft was established at about 4:40 a. m. The aircraft was approaching from the east, that is, from the direction of Austin, Llano and Mason.[2] Approximately fifteen or twenty minutes after Agent Vera landed at Mathis Field, the unidentified aircraft made radio contact with San Angelo Tower requesting landing instructions. Just before landing this aircraft gave 7864 as its call number, which it corrected on landing to 764 Victor. When the aircraft landed its lights were on. The plane was a Douglas DC–3, a twin-engine aircraft of the type used to carry cargo during World War II. Customs agents and local officials stopped the plane and surrounded it. Three people were in the cockpit area; Niver was crouched behind the other two, wearing a pair of headphones.

The government agents approached the DC–3 from the left front and noticed oil being thrown from one of its engines. They determined that the identification numbers of the aircraft were taped on and that there was no Victor sign displayed. Vera testified at the suppression hearing that his experience as a government agent led him to believe that the falsification of numbers was a clear sign that the plane was involved in a contraband smuggling operation.

1. The trial court found that "on this particular date, at the time in question, the testimony was that all other aircraft in the area, and under these weather conditions, were under positive radar contact, as contrasted with the total lack of contact with this aircraft."

2. A short time before this, Fort Worth Radar had picked up a possible target inbound to San Angelo. This was a Customs plane, Omaha 21, which was using a transponder, and was later identified by use of the transponder code.

The three defendants were ordered to stick their hands out of the windows in the cockpit while Vera opened the side door of the DC–3 to look for anyone else who may have been on board. Upon opening the side door of the DC–3, Agent Vera immediately smelled the odor of marijuana and observed numerous bundles which resembled bundles that had contained marijuana in previous air smuggling seizures Vera had participated in. Inspection of the contents of the DC–3 revealed forty-four bundles of marijuana weighing approximately 2840 pounds.

Agent Vera's examination of the instrument panel indicated that the DC–3 had arrived at Mathis Field from an easterly direction. The DC–3 had also been observed approaching Mathis Field from the east when it was first spotted. The plane was equipped with a transponder, but it was not transmitting. Documents found inside the aircraft reflected its true identification number to be N583V. The number displayed on the DC–3 was 7864, a number which was assigned to a light, single-engine aircraft.

A navigation map was found in the cockpit of the DC–3 with a dotted line drawn on it beginning in the area of Central America and continuing near Galveston Island, along the Red River Valley between Texas and Louisiana, and ending in the area of Fort Smith, Arkansas. The DC–3 had two fuel bladders aboard, one with a capacity of five hundred gallons and one with a capacity of four hundred gallons. A search of codefendant Niver's personal luggage revealed a small amount of marijuana.

No warrant was issued for the search of the plane or for Niver's suitcase.

## II. THE MOTION TO SUPPRESS EVIDENCE UNLAWFULLY SEIZED.

■ The district court denied the defendants' motion to suppress the evidence on the grounds that the searches of the aircraft and luggage were border searches justified by reasonable suspicion, or alternatively probable cause. The defendants contend that the district court applied an improper standard for determining whether the search occurred at the border, and that we must remand for findings as to whether there was "reasonable certainty" that this was an "extended border search." We hold that the search was not unlawful because it occurred at the functional equivalent of the border, and we accordingly affirm the district court's denial of the motion to suppress.[3]

■ In general, warrantless searches and seizures are unreasonable under the fourth amendment except those falling within a few narrowly defined exceptions. *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). One of these exceptions is the warrantless search at the international border, which is justified on the basis of the sovereign's historical right to protect itself by examining people and property entering the country. *United States v. Ramsey,* 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977); *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). Not only may government officials search property at the border without a warrant, but they need not have any suspicion to justify their search. *United States v. Sandler,* 644 F.2d 1163 (5th Cir. 1981) (en banc).

■ The courts have recognized a number of different types of situations which are often referred to as "border searches," but which require different levels of suspicion to justify the actual search. Unfortunately, the courts have not always been careful to explain which type of search was involved, thereby creating unnecessary confusion in the area. We need only concern ourselves with whether the searches of the aircraft and luggage were "functional equivalent of the border" searches which

---

**3.** Although we agree with the defendants that the district court applied the wrong standard in denying the motion to suppress, we need not remand for a specific finding as to whether there was reasonable certainty that the DC–3 crossed the border, but may make that determination ourselves on the basis of the record before us. *See United States v. Stone,* 659 F.2d ·569 (5th Cir. 1981).

are permitted just as if the search actually occurred at the international boundary line, *see Almeida-Sanchez v. United States,* 413 U.S. 266, 272, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973), or whether they were "extended border searches," requiring at least a reasonable suspicion of criminal activity to justify the search. *See United States v. Richards,* 638 F.2d 765 (5th Cir.), *cert. denied,* 454 U.S. 1097, 102 S.Ct. 669, 70 L.Ed.2d 638 (1981).[4]

■ The defendants contend, and we think rightly so, that whatever type of search is involved, a border crossing must be demonstrated by more than reasonable suspicion or probable cause. We have generally required a showing beyond a "reasonable certainty" that the entity searched has crossed the international border, *United States v. Ivey,* 546 F.2d 139 (5th Cir. 1977), or "a high degree of probability that a border crossing took place." *United States v. Brennan,* 538 F.2d 711, 715 (5th Cir. 1976), *cert. denied,* 429 U.S. 1092, 97 S.Ct. 1104, 51 L.Ed.2d 538 (1977). The standard of "reasonable certainty" has been described by the Ninth Circuit as something more than probable cause, but less than beyond a reasonable doubt. *United States v. Driscoll,* 632 F.2d 737, 739 (9th Cir. 1980). The Eleventh Circuit has recently summarized the essence of the functional equivalent of the border:

> A search within the border may also be justified as a border search requiring no warrant nor any suspicion if there is reasonable certainty that the object or person searched has just crossed the border, there has been no time or opportunity for the object to have changed materially since the time of crossing, and the search is conducted at the earliest practicable point after the border was crossed. Justice Stewart's example of the search of an aircraft at its first point of landing in the United States after an international flight is the paradigm example of this type of search. *Almeida-Sanchez v. Unit-*

*ed States, supra,* 413 U.S. at 272, 93 S.Ct. at 2539. This type of search is justified under the border-search doctrine because it is in essence no different than a search conducted at the border; the reason for allowing such a search to take place other than at the actual physical border is the practical impossibility of requiring the subject searched to stop at the physical border.

*United States v. Garcia,* 672 F.2d 1349, 1363–64 (11th Cir. 1982).

■ The main difference between the functional equivalent of the border search and an extended border search is that the latter takes place *after* the first point in time when the entity might have been stopped within the country. The extended border search still requires a showing beyond reasonable certainty both that the border has been crossed and that conditions have remained unchanged since the time of the border crossing. *Richards, supra.* The court elaborated on the justifications for these delayed searches in *Garcia:*

> The rationale for these cases, which sometimes use the "extended border search" terminology, is grounded in part on the fact that the border has been crossed and additionally on the special need of law enforcement officials to defer apprehension of those suspected of being engaged in illegal smuggling activities in circumstances where surveillance may lead them to "'higher ups' or other cohorts" in the illegal enterprise, *United States v. Fogelman,* 586 F.2d 337, 348 (5th Cir. 1978), or to further evidence of the criminal activity.

672 F.2d at 1364. Since extended border searches entail a greater intrusion on legitimate expectations of privacy, they are permitted only if supported by reasonable suspicion. *Richards.*

Defendants conceded during oral argument that a border crossing took place

---

4. No one contends that a search at San Angelo, Texas would be a search *at* the border. Similarly, the regulatory type searches at fixed checkpoints, *United States v. Ortiz,* 422 U.S.

891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975), and by roving patrols, *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), are not involved in this case.

sometime during the early morning hours of February 9, 1981. They maintain, however, that the government has made no showing that the aircraft searched in San Angelo was the same aircraft that crossed the border. The critical question in this case, therefore, is whether there is a reasonable certainty that only one aircraft was involved.

Framed in this way, it becomes apparent that if the searches were constitutional, it is because they occurred at the functional equivalent of the border, and not within the extended border area. If Agent Vera was tracking only one aircraft, then he searched it at the first possible opportunity, when it landed in San Angelo. There is no evidence whatsoever in the record that the aircraft, sighted seventy miles off of Galveston Island, landed anywhere within the United States before the landing in San Angelo. In fact, all parties seem to agree that a landing was not possible at most of the airports where the aircraft (or aircrafts) was sighted. Certainly, there was not an opportunity to land, load more than a ton of marijuana into the plane, and take off again during the time when the aircraft was lost from the radar screen. This is not a case where agents followed a vehicle as it made its rounds into the interior, only to stop it when they believed it worth their while. *See, e.g., United States v. Martinez,* 481 F.2d 214 (5th Cir. 1973), *cert. denied,* 415 U.S. 931, 94 S.Ct. 1444, 39 L.Ed.2d 489 (1974). If we can be reasonably certain that Agent Vera searched the aircraft that had crossed the border, then this case would fall squarely within Justice Stewart's example of a functional equivalent of the border where a non-stop flight from a foreign country is searched when it first lands in the United States. *Almeida-Sanchez, supra,* 413 U.S. at 272, 93 S.Ct. at 2539.

Defendants, relying on *United States v. Johnson,* 588 F.2d 147 (5th Cir. 1979), contend that *constant* surveillance of the aircraft, from the time of the border crossing until the search, is required to support the search. They maintain that the numerous gaps in the radar tracking of the aircraft, when the plane was lost from the screen for as long as twenty minutes at a time, are fatal to the government's attempt to justify its search. In *Johnson,* we merely suggested that constant surveillance was one way the government could demonstrate the functional equivalent of a border search. Similarly, constant surveillance would support a government claim that there had been no alteration since the border crossing in the extended border context. *Richards, supra; Fogelman, supra.* In fact, we have not even imposed a requirement that the customs officials actually observe the border crossing as long as we can be reasonably certain of the crossing on the basis of reasonable inferences from the circumstances. *United States v. Ingham,* 502 F.2d 1287, 1291 (5th Cir. 1974), *cert. denied,* 421 U.S. 911, 95 S.Ct. 1566, 43 L.Ed.2d 777 (1975).

Normally, the issue is whether an international crossing has occurred. For example, in *United States v. Brennan,* 538 F.2d 711 (5th Cir. 1976), we were not convinced that a border crossing had taken place where the plane departed from Melborne, Florida, was lost over Miami where most of the air traffic in the vicinity was domestic, and was picked up again only when it returned to Melborne. Similarly, in *United States v. Johnson, supra,* there was no evidence that the duffel bag searched had been in the vehicle *at the time* the vehicle crossed the border. In contrast, we upheld the search of a plane known to have departed from a foreign country, purportedly en route to another foreign destination, when it arrived unannounced in a secluded United States airport thirteen hours later. *United States v. Ivey,* 546 F.2d 139 (5th Cir. 1977).

In *United States v. Stone,* 659 F.2d 569 (5th Cir. 1981), we upheld a search where the identity of the aircraft may originally have been in question. We specifically noted that an aircraft had been sighted over foreign airspace after a reported near midair collision, and the aircraft searched showed signs of damage. There had also been uninterrupted surveillance of the aircraft from the first sighting until touch-

down. As in *Stone,* an aircraft in this case was sighted over foreign air space, seventy miles south of Galveston Island. Agent Vera, a customs pilot for approximately eight years with 4700 hours of flying time, believed the aircraft he was following was either low on fuel or having mechanical problems and that it was desperate to find an airport where it could land. He based his conclusion on his observations that the aircraft was frequently altering its course and changing its speed as it arrived in the Houston area, that it was making an apparent attempt to land at Austin, and that it was dangerously circling small airports west of Austin and near Llano and Mason. The government agents noticed oil being thrown from one of the engines of the plane searched, which corroborated Vera's suspicions.

As in *Stone,* the aircraft when originally sighted and when actually stopped bore signs of smuggling activity. While a showing of suspicious behavior is not necessary in the context of a search at the functional equivalent of the border, the fact that the aircraft appeared to be engaged in smuggling activity both at the initial and final stages of the surveillance is a further indication that only one plane was involved. The DC–3, originally targeted by Agent Vera was not operating a transponder, had no flight plan, and was flying at night towards the United States on a route commonly used by aircraft arriving from Central or South America, all of which were indications of smuggling activity. *Stone, supra,* at 571. Similarly, the pilot's misstatement of the aircraft's call numbers before landing; and the obvious taped alteration of the numbers on the aircraft itself, aroused the agents' suspicions when the plane finally landed.

As noted above, the aircraft in *Stone* was under constant surveillance, while the aircraft in this case was not. Defendants point out that the control facilities initially advised on an aircraft that turned out to be another customs plane. The aircraft that landed had its lights on and had a transponder, although there was no indication that it was in use. Defendants also emphasize that Agent Vera was unable to say whether other control towers had reported the landing of an unidentified aircraft. They would raise the possibility that there were two unidentified aircraft smuggling marijuana into Texas on that dark and foggy night in February.

The weather conditions existing on February 9, 1981 provide the determining factor in the government's case. Because of the early morning hours and the weather, there was very little air traffic during the three and one-half hour period in question. The dense fog limited visibility in the entire South and Southwest Texas area, permitting landings only at Waco and San Angelo. The control towers in the area were alerted to be on the lookout for an unidentified aircraft without a flight plan and *none* was reported.[5] The agents were able to determine that there was only one unidentified aircraft desperately searching for a place to land, on the basis of the timing and routes taken by the plane.[6]

Had there been clear weather and heavy air traffic during the time of the events in question we might be more concerned about the absence of constant surveillance, but such is not the case. The area was covered by dense fog and only one unidentified aircraft was reported in the vicinity. The light air traffic caused by the poor weather conditions, the absence of any report of other unidentified aircraft in the vicinity, and the fact that the plane Agent Vera was following as well as the plane searched seemed to be having mechanical difficulties, all lead us to conclude that the government has demonstrated beyond a reasonable cer-

---

**5.** The second customs aircraft was quickly identified after its initial sighting.

**6.** In fact, the aircraft displayed highly suspicious behavior outside of Austin. It was lined up to land, although it had made no radio contact with the control tower, when it abrupt-

ly turned and headed toward Llano. This occurred almost immediately after, and perhaps because, Agent Vera discussed the presence of law enforcement officials waiting at the airport over the radio.

tainty that the DC–3 searched was the aircraft sighted off the coast of Texas which subsequently crossed the international boundary and landed in San Angelo. Since the searches occurred at the functional equivalent of the border, the customs officials could search both the aircraft and the luggage without any suspicion whatsoever, *Sandler, supra,* and we hold the searches constitutional.[7]

## III. THE SUFFICIENCY OF THE EVIDENCE.

 The defendants also contend that their convictions should be reversed on the grounds that the prosecution failed to prove the allegations made against them. In evaluating this contention, we must consider the evidence in the light most favorable to the government. Our task is not to reweigh the evidence or to determine the credibility of the witnesses, and we must affirm the verdict if it is supported by substantial evidence. *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). Even where defendants are convicted after a bench trial: "The test is whether the evidence is sufficient to justify the trial judge, as trier of facts, in concluding beyond a reasonable doubt that the defendant was guilty...." *Gordon v. United States,* 438 F.2d 858, 868 n.30 (5th Cir.), *cert. denied,* 404 U.S. 828, 92 S.Ct. 139, 30 L.Ed.2d 56 (1971); *United States v. Hull,* 437 F.2d 1, 3 (5th Cir. 1971); *see generally* 3 C. Wright, *Federal Practice and Procedure* § 374 (1982).

The defendants were convicted on all four counts. Defendant Niver asserts that there was no evidence to show that he was anything more than a "mere passenger" on the DC–3 aircraft, without any knowledge of its cargo. He points out that the contraband was enclosed in sacks in the cargo hold of the aircraft, while he was in the cockpit. By adopting defendant Niver's arguments, defendants McCune and Penland apparently make the same contentions. We find McCune's and Penland's challenges to the sufficiency of the evidence to be without merit and also affirm the conviction on the first three counts of defendant Niver.

When the DC–3 aircraft landed at San Angelo, Texas, United States Customs agents observed three people in the cockpit. Defendant McCune was in the pilot's seat, defendant Niver was standing between the pilot's seat and copilot's seat wearing a set of non-operational headphones, and defendant Penland occupied the copilot seat. A DC–3 aircraft is required to have both a pilot and a copilot. There were only three people aboard the aircraft.

 The possession and importation counts do not require a showing of actual possession. Constructive possession may be proved where the defendant owns, has dominion over or controls the premises or vehicle where contraband is seized. *See, e.g., United States v. Martinez,* 588 F.2d 495 (5th Cir. 1979) (possession of the key to the trunk of the car sufficient even where defendant was not in the car when the contraband was confiscated); *United States v. Christian,* 505 F.2d 94 (5th Cir. 1974). Similarly, conspiracy does not require the production of direct evidence, *Glasser, supra,* but may be proven by a showing sufficient to infer knowledge of the existence of the illegal cargo. *United States v. Freeman,* 660 F.2d 1030 (5th Cir. 1981); *United States v. Mazyak,* 650 F.2d 788 (5th Cir. 1981), *cert. denied,* 455 U.S. 922, 102 S.Ct. 1281, 71 L.Ed.2d 464 (1982); *United States v. Alfrey,* 620 F.2d 551 (5th Cir.), *cert. denied,* 449 U.S. 938, 101 S.Ct. 337, 66 L.Ed.2d 160 (1980).

 As the pilot and copilot, defendants McCune and Penland clearly may be convicted of the substantive offenses since they had control over the aircraft. The pilot's misstatement of the plane's call numbers before landing, as well as the obvious taped alteration on the aircraft itself, support both defendants' convictions for displaying aircraft marks that were mislead-

---

**7.** Because the searches occurred at the functional equivalent of the border, we need not determine the effect of the Supreme Court's decision in *United States v. Ross,* —— U.S. ——, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982), on the searches of the personal luggage.

ing on the aircraft which they piloted. Finally, their inferable knowledge of the illegal nature of their cargo is sufficient evidence to support the convictions for conspiracy. *See, e.g., Mazyak, supra.*

■ As Niver points out, the government must show more than the mere presence of a large quantity of contraband on the vessel in order to convict the defendant. *United States v. Willis,* 646 F.2d 189 (5th Cir. 1981). The cases cited by Niver, however, involved situations where the evidence did not support an inference of knowledge of the presence of contraband on board. In *United States v. Jackson,* 588 F.2d 1046 (5th Cir.), *cert. denied,* 442 U.S. 941, 99 S.Ct. 2882, 61 L.Ed.2d 310 (1979), the contraband was in a suitcase in the unclaimed luggage room at the airport. Although the defendants had gone near the luggage room, they did not try to claim the suitcase and they did not have any claim ticket. The defendants' conspiracy conviction, however, was affirmed. In *United States v. Stephenson,* 474 F.2d 1353 (5th Cir. 1973), the heroin was discovered in a bar where defendant was merely a customer.

The government has cited a number of cases which elaborate which facts will support a conviction for conspiracy or possession of narcotics. In *United States v. Alfrey,* 620 F.2d 551 (5th Cir. 1980), we looked to the length of the voyage, the quantity of marijuana, the relationship between captain and crew, as well as the late hour of arrival, and defendant's behavior and unexplained presence on board.[8] *See also United States v. Freeman,* 660 F.2d 1030 (5th Cir. 1981). In *United States v. Whitmire,* 595 F.2d 1303 (5th Cir. 1979), *cert. denied,* 448 U.S. 906, 100 S.Ct. 3048, 65 L.Ed.2d 1136 (1980), we affirmed a conviction for possession and distribution where defendant was standing in a place in the boat where the odor of marijuana was "overpowering" and she was wearing a teeshirt from the boat's foreign point of origin. We also noted the quantity

of marijuana (1500 pounds) seized from a small boat (25 feet), the length of the voyage and the relationship between the defendants (husband and wife).

■ In the instant case, Niver's conviction was supported by more than his "mere presence" on the aircraft. The Customs agent immediately detected the smell of marijuana when he opened the door of the DC–3, and the sacks containing the 2840 pounds of contraband were in plain view of anyone entering the aircraft. Niver apparently could recognize the smell and sight of marijuana, since a small quantity of it was found in his personal luggage. While Niver's counsel suggested at oral argument that Niver might have been a "hippy" hitching a free ride home, the suggestion is unlikely.

Further, Niver was a "passenger" in an aircraft engaged in highly suspicious activity. The aircraft arrived late at night without its lights on from Central or South America. It was flying at a low altitude in the clouds when it could have flown at a slightly higher altitude under clear skies, all of which leads to an inference that its occupants were trying to escape detection. There was no flight plan on file with the F.A.A. and the occupants did not make radio contact with the ground facility upon entering the Air Defense Identification Zone as required by law. Immediately before the aircraft landed, the pilot misstated its call numbers and the numbers on the side of the plane had been altered with tape, a fact presumably noticed by Niver when he boarded the plane. In light of the significant quantity of marijuana strewn inside the aircraft and the suspicious circumstances surrounding its arrival into the United States, the conclusion is virtually inescapable that the aircraft contained three smugglers, not two, who had conspired to possess and distribute marijuana and who were in possession of and importing their illegal merchandise. Niver's conviction on the first three counts is accordingly affirmed.

---

8. Defendant Kennedy's conviction for possession was affirmed, but the conspiracy conviction was reversed because we thought it likely that he had come on board the ship after it

entered the United States. Niver, however, had to have crossed the border in the aircraft as discussed in part II.

As we have noted, Niver was also convicted under the fourth count involving alteration of aircraft markings, the sentence to run concurrently with the sentence for possession. As a result of this sentencing, and in the interests of judicial economy, we choose not to engage in a detailed review of the conviction under the alteration count, but vacate the conviction instead. This action "does not impair any need of the government" and "avoids the possibility of adverse collateral consequences to the defendant." *United States v. Cardona,* 650 F.2d 54, 58 (5th Cir. 1981) (citing *United States v. Hooper,* 432 F.2d 604, 606 (D.C.Cir.1970)); *See also United States v. Warren,* 612 F.2d 887, 891 (5th Cir.), *cert. denied,* 446 U.S. 956, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980) (en banc) (Roney and Hill, JJ., concurring and dissenting). If at some later date, reimposition of the sentence is necessary in the interests of justice, the government may raise the issue by requesting the district court to reinstate the conviction, and if the district court does so, the reinstated conviction would then be subject to appellate review. *United States v. Morisse,* 660 F.2d 132 (5th Cir. 1981); *Cardona, supra.*

AFFIRMED IN PART and VACATED IN PART.