**UNITED STATES of America**

v.

**Jeffrey Thomas STRMEL and Gregory Kirk Bell.**

**Crim. A. No. 83–317.**

United States District Court, E.D. Louisiana.

Oct. 17, 1983.

Tom Watson, Asst. U.S. Atty., New Orleans, La., for plaintiff.

Provino Mosca, New Orleans, La., for Jeffrey Thomas Strmel.

Frank DeSalvo, New Orleans, La., for Gregory Bell.

WICKER, District Judge.

This matter came before the Court on a former date on motions of defendants, Jeffrey Thomas Strmel and Gregory Kirk Bell to suppress evidence seized following their arrest on June 24, 1983 for possession and possession with the intent to distribute marijuana. Defendants claimed that the search of a trailer by the United States Customs Service (Customs), the installation of two electronic "beepers" on the trailer, and post-arrest searches of the trailer and Bell's tractor cab violated their Fourth Amendment right against unreasonable searches and seizures. Finding that the search and installations did not violate defendants' Fourth Amendment rights, and that the subsequent search incident to arrest would have been lawful even had the previous governmental acts violated defendants' constitutional rights, the Court DENIED the motions and now enters its written reasons.

FACTS

On May 29, 1983, a trailer containing wicker furniture arrived in Houston, Texas from Venezuela aboard the M/V ZULIA. Customs did not inspect the trailer in Houston, but shipped it under Customs IT Transit bond to New Orleans, Louisiana. The "Transportation Entry and Manifest of Goods Subject to Customs Inspection and Permit" (Transportation Entry), Customs Form 7512 (Government Exhibit 2), designated New Orleans as the "port of exit or destination" in the United States. On June 22, 1983, Hunter Transportation, a bonded carrier licensed by Customs, delivered the Customs-sealed trailer to Bowman Transportation in New Orleans, where it remained in Customs custody.

At Bowman, Customs agents checked the trailer and its documents against a profile. The trailer was consigned to a David Schultz of St. Petersburg, Florida; over $8,000.00 had been paid in freight and delivery charges for the shipment whose value was designated as $11,000.00; and the license tag on the trailer, F68060, had no registered owner in the State of Florida. Based on the suspiciously disproportionate cost of freight, lack of Florida registration, the fact that the consignee was a first-time importer, and that Schultz had made numerous anxious telephone calls to Bowman to determine when he could pick up the trailer, Customs decided to open and inspect the trailer.

On June 23, 1983, Customs broke the seal, opened the trailer, removed the furniture, and employed a trained dog to "sniff" for drugs. Inside the trailer, the dog alerted officers of the presence of contraband behind the wall in the front of the trailer. Officials noted at that time that the interior dimensions of the trailer appeared to be somewhat shorter than the exterior.

Customs agents then removed the plywood paneling covering this wall. Behind it was sheet metal into which the agents made a hole, using a hammer, chisel, and tin snips, discovering a compartment containing boxes, two of which they removed. After the agents opened the boxes and

discovered what field tests proved to be marijuana, the Drug Enforcement Agency at New Orleans was notified. Customs then measured the outside and inside dimensions of the trailer and estimated that a secret compartment, 4 feet × 8 feet × 9 feet was behind the false wall, containing roughly 7500 pounds of marijuana. At this time Customs agents decided to attempt a "controlled delivery" of the trailer.

A Customs agent installed a "cargo beacon" on the false wall inside the trailer. The beacon was an electronic transmitting device which would emit radio signals only if someone attempted to enter the secret compartment. Thereafter, the agent attached a direction finding device to the underside of the trailer. Both "beepers" were installed the evening of June 23, 1983.

At 8:00 a.m. on June 24, 1983, Customs released the trailer from its custody. Mr. Schultz was contacted and at his request Bowman agreed to stay open beyond its normal closing time of 4:00 p.m. so that his drivers could come to pick up the trailer. The trailer was under constant surveillance by DEA and Customs agents. At approximately 5:00 p.m. defendants Strmel and Bell arrived at Bowman in Bell's tractor along with a tan Pontiac bearing Florida plates. Bell showed Bowman employees a Bill of Lading (Defendants' Exhibit 3) authorizing him to obtain custody of the trailer. Agents observed Bell using a radio frequency detector, a device employed to detect the presence of electronic surveillance, on the trailer.

After attaching the tractor to the trailer, Bell and Strmel drove out of Bowman, followed by the Pontiac and Customs and DEA agents, and drove onto Interstate 10 heading East. A police records search revealed that the Pontiac had been reported stolen.

The Pontiac slowed to allow surveillance cars to pass. Customs agents then stopped the car to see if it were stolen while others continued to follow Strmel and Bell. Thereafter, agents observed Strmel and Bell attempting to locate the Pontiac by visual sightings.

Defendants pulled off at the first exit in Slidell, Louisiana where they changed the license plates on the trailer. They then stopped at the weigh station in Slidell and went on to the Slidell Union 76 Truck Stop. Arriving at approximately 6:30 p.m., Bell and Strmel ate dinner and sat around the truck stop. Bell was observed making telephone calls.

At approximately 10:00 p.m. Bell and Strmel were about to drive the tractor-trailer out of the truck stop when the agents arrested them.

Bell's tractor was driven to the Slidell police station where it and the trailer were searched. Officials found about 7800 pounds of marijuana in the trailer and a radio frequency detector in a soft-sided briefcase in the cab of Bell's tractor. Defendants wish to suppress this evidence.

## I. STANDING

The Government contends that, since defendants have no proprietary interest in the trailer, they have no standing to bring this motion.

■ Fourth Amendment rights are personal rights which may not be vicariously asserted. Its protections, embodied in the exclusionary rule, extend only to defendants whose own rights have been violated. *Rakas v. Illinois,* 439 U.S. 128, 134, 99 S.Ct. 421, 425, 58 L.Ed.2d 387 (1978).

In *Rakas,* the Supreme Court considered whether automobile passengers could assert Fourth Amendment rights with respect to items located in a car in which they were riding. The Court held that the issue of whether they were legitimately on the premises is not determinative of whether they had Fourth Amendment rights; rather, the inquiry was whether the areas were ones in which a passenger *qua* passenger would normally have an expectation of privacy. 439 U.S. at 148–49, 99 S.Ct. at 433. Thus, the defendants did not have a legitimate expectation of privacy in the glove compartment or the area under the seat where evidence was found.

The Court in *Rakas* merged issues of standing and substantive Fourth Amendment law. The determinative inquiry became "whether the challenged search or seizure violated the Fourth Amendment rights of a criminal defendant who seeks to exclude the evidence obtained during it. That inquiry in turn requires a determination of whether the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect." 439 U.S. at 140, 99 S.Ct. at 429.

In *Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980), the defendant sought to suppress drugs he owned which were seized from an acquaintance's purse. The Supreme Court held that defendant's Fourth Amendment rights were not violated because he had no expectation of privacy in the purse. The Court reaffirmed the *Rakas* approach to standing as an inquiry that focused directly on the substance of defendant's claim that he or she possessed a "legitimate expectation of privacy" in the area searched under the Fourth Amendment. The Court held that, subsequent to *Rakas*, the two inquiries of standing and reasonable expectation of privacy merge into one: "whether governmental officials violated any legitimate expectation of privacy held by petitioner." 448 U.S. at 106, 100 S.Ct. at 2562.

The Fifth Circuit interpreted the *Rakas-Rawlings* standing merger in *U.S. v. Parks*, 684 F.2d 1078 (5th Cir.1982). Under *Parks* a defendant must show that governmental action infringed an interest of his own which the Fourth Amendment was designed to protect. 684 F.2d at 1083. In that case, one defendant, Holloway, although having custody and control of an airplane, failed to show that his own rights were violated. Although the defendant had a key to the plane given to him by an unidentified third party, this third party was not shown to have had any other indicia of ownership, possession, or authority. Since the defendant could not show that his possession was legitimate, his Fourth Amendment rights were not invoked.

■ Defendant Bell's situation differs from Holloway's in *Parks*. The tractor which Customs searched was owned by Rainbow Transport, a company which Bell owns. Bell was legitimately in the truck in which he had a proprietary interest and a legitimate expectation of privacy. He has standing to challenge its search.

Bell also was in possession of the Bill of Lading (Defendants' Exhibit 3) which he received from Schultz. Bell proffered this to Bowman to receive custody of the trailer. Although Bell was not the consignee, he picked up the trailer at the consignee's request. Bell was in lawful possession of the trailer. *See U.S. v. Richards*, 638 F.2d 765, 769–70 (5th Cir.1981), *cert. denied*, 454 U.S. 1097, 102 S.Ct. 669, 70 L.Ed.2d 638 (1981). In addition, it was attached to his tractor. Thus, Bell also had a legitimate expectation of privacy in the trailer.

■ The same is not true of Strmel. Strmel did not own the truck, possess the Bill of Lading, or have a possessory or proprietary interest in either. His case is analogous to the defendant in *Rakas*. As a mere passenger, although legitimately in the vehicle, Strmel did not possess a legitimate expectation of privacy either in the trailer attached to the back of the tractor or in the soft-sided briefcase in the tractor in which the radio frequency detector was found.[1] Since Strmel's own privacy rights were not affected, he has no standing to seek suppression of the evidence.[2]

---

**1.** Nor did Strmel claim a possessory interest in either the marijuana or the radio frequency detector itself. *Compare Rawlings v. Kentucky*, 448 U.S. 98, 105–06, 100 S.Ct. 2556, 2561–62, 65 L.Ed.2d 633 (1982).

**2.** Although subsequent sections of this opinion analyze the Fourth Amendment rights of Bell only, the same Fourth Amendment analysis and legal conclusions would apply to Strmel as well. Thus, since the initial Customs search of the trailer (Section II) and the installation of the beepers (Section III) were lawful and since abundant probable cause existed for the search subsequent to arrest, even had the Customs search been improper (Section IV), the Court would not have suppressed the evidence used

## II. THE CUSTOMS SEARCH [3]

■ This case presents a novel question of law: whether United States Customs officials may, within the bounds of the Constitution, search imported goods at the port of Customs exit when that city is distant from the point where the goods first crossed the border into the country, and cause to search first arose, not at the border, but at the port of exit. The Court concludes that the search was permissible since the port of exit is "the functional equivalent of a border" or the search was an "extended border search" supported by reasonable suspicion.

■ Warrantless searches are inherently "unreasonable" and, hence, unconstitutional under the Fourth Amendment, except where conducted in a few narrowly defined situations where the circumstances justifying the search outweigh privacy rights. *Coolidge v. New Hampshire*, 403 U.S. 443, 454–55, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971); *Richards, supra*, 638 F.2d at 770.

■ Border searches are an exception to the Fourth Amendment's warrant requirement and are reasonable simply by virtue of the fact that they occur at the border. *U.S. v. Ramsey*, 431 U.S. 606, 616–19, 97 S.Ct. 1972, 1978–80, 52 L.Ed.2d 617 (1977); *Richards, supra*, 638 F.2d at 770. Since based upon the historical right of the sovereign to protect itself by stopping and examining persons and property crossing into its territory, border searches require neither probable cause nor a warrant. *Ramsey, supra*, 431 U.S. at 616, 619, 97 S.Ct. at 1978, 1980.

■ Such searches need not take place at an actual border since courts have recognized that "the need to protect personality and property against warrantless invasion must be balanced against the myriad difficulties facing customs and immigration officials who are charged with the enforcement of smuggling and immigration laws." *Richards, supra*, 638 F.2d at 771. Warrantless searches may occur at "the functional equivalent of a border," *Almeida Sanchez v. U.S.*, 413 U.S. 266, 272–73, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973); *U.S. v. Niver*, 689 F.2d 520, 529 (5th Cir. 1982), or may be conducted according to an "extended border search," *U.S. v. Garcia*, 672 F.2d 1349, 1366–67 (11th Cir.1982), *Richards, supra*, 638 F.2d at 771–73.[4]

The Fifth Circuit in some cases has applied a tripartite test to determine if a search is at "the functional equivalent of a border." The court considers "relative permanence of the checkpoint; minimal interdiction by the checkpoint of the flow of domestic traffic; and the practical necessity of the substitution of the interior checkpoint for the border in order to monitor international traffic." *U.S. v. Dreyfus-de-Campos*, 698 F.2d 227, 229 (5th Cir.1983), *cert. denied*, — U.S. —, 103 S.Ct. 2128, 77 L.Ed.2d 1306 (1983); *U.S. v. Reyna*, 572 F.2d 515, 517 (5th Cir.1978), *cert. denied*,

---

against Strmel even had he demonstrated an expectation of privacy in the tractor and trailer.

**3.** In this case, once Customs agents broke into the trailer and removed the furniture, they employed a trained dog to "sniff" for contraband. The Supreme Court has held that since dog sniffs are limited in the content of information revealed, they are *sui generis* and do not, at least in the airport search context, constitute a Fourth Amendment "search." *U.S. v. Place*, — U.S. —, —, —, 103 S.Ct. 2637, 2644–45, 77 L.Ed.2d 110 (1983). Here a search definitely took place since Customs broke into the locked trailer. However, the dog sniff does not constitute an additional intrusion or further impinge upon defendants' expectation of privacy.

**4.** Courts have applied a third judicial gloss upon border search doctrine. Under Border-Patrol cases a search may take place at a permanent facility relatively near a border where practically necessary to control the flow of persons and objects into the country. A detention authorized under this theory does not require a showing that the vehicle or item detained actually crossed the border, "so long as the location of the detention and its scope are such to ensure that it is necessary for controlling traffic across the border and that its intrusiveness on the privacy of those lawfully in the country is limited." *U.S. v. Garcia*, 672 F.2d 1349, 1362–63 (11th Cir.1982). *See e.g., U.S. v. Martinez-Fuerte*, 428 U.S. 543, 566–67, 96 S.Ct. 3074, 3087, 49 L.Ed.2d 1116 (1976); *U.S. v. Reyna*, 572 F.2d 515, 517–18 (5th Cir.1978), *cert. denied*, 439 U.S. 871, 99 S.Ct. 203, 58 L.Ed.2d 183 (1978).

439 U.S. 871, 99 S.Ct. 203, 58 L.Ed.2d 183 (1978). This type of analysis is appropriate when determining whether an interior border checkpoint facility operates as the functional equivalent of a border. The test is not helpful in considering whether locations other than border checkpoints are functional equivalents.

■ An area need not be a permanent Customs checkpoint in order to be the functional equivalent of the border and "Fifth Circuit cases ... have upheld searches following a border crossing, whether at the actual border or elsewhere, without regard to the regularity of conducting searches at the particular site involved." *Garcia, supra,* 672 F.2d at 1361–62. That is, an area may be a border equivalent under particular circumstances presented by a specific case.[5]

In *Niver, supra,* the Court held that a Customs search of an airplane in San Angelo, Texas was constitutional since San Angelo was the earliest practicable point to search after the border was crossed, 689 F.2d at 526–29. Likewise, in *U.S. v. Stone,* 659 F.2d 569 (5th Cir.1981), an aircraft, first sighted over foreign air space, was monitored as it entered American air space and touched down in Orlando, Florida. The Court held a Customs search in Orlando permissible as a border search since the object under such surveillance "brings the border with it" to the point of the search. 659 F.2d at 572. Other Fifth Circuit cases have held that searches of ships within previously-entered territorial waters, *U.S. v. Williams,* 617 F.2d 1063, 1096 (5th Cir. 1980) (Rubin, J., concurring) or at the port where a ship first docks, *U.S. v. Prince,* 491 F.2d 655 (5th Cir.1974) and searches of international mail at its port of entry, *U.S. v. Pringle,* 576 F.2d 1114 (5th Cir.1978) are

border searches since conducted at points considered functional equivalents.

In *U.S. v. Marienne Martinez,* 577 F.2d 960 (5th Cir.1978), *cert. denied sub nom. Cruz-Ojeda v. U.S.,* 439 U.S. 914, 99 S.Ct. 288, 58 L.Ed.2d 262 (1978) defendants, after arriving from the Bahamas, claimed their luggage at the airport, passed through Customs and loaded their belongings in the back of a station wagon. Customs officers, who knew defendants were carrying contraband and had kept them under constant surveillance after they crossed the border, apprehended the smugglers in the airport parking lot. The Court held that defendants were still subject to a Customs search for which no warrant is required although they had already left the strict limits of the Customs area. 577 F.2d at 962.

Although this Court has found no case in which the Fifth Circuit has done so, the Eleventh Circuit has set forth a test for functional equivalency in this type of case.[6] A search within the border may be justified as a border search, requiring no warrant or suspicion, if there is "reasonable certainty that the object or person searched has just crossed the border, there has been no time or opportunity for the object to have changed materially since the time of crossing, and the search is conducted at the earliest practicable point after the border was crossed." *Garcia, supra,* 672 F.2d at 1363–64.

In this case, Customs in New Orleans was certain that the trailer had crossed the border. It had supervised the offloading of the ship in Houston and held the Transportation Entry (Government Exhibit 2) which showed that New Orleans was the port of Customs exit of an item whose origin was Venezuela. There was no time or opportunity for the trailer to have changed materi-

---

**5.** The Fifth Circuit has not followed its own permanency requirement for functional equivalency since the Circuit has not sorted out the three separate and distinct bases for upholding warrantless searches near borders which the Eleventh Circuit recently has delineated clearly: the functional equivalent, extended border search, and checkpoint search doctrines. *See U.S. v. Garcia,* 672 F.2d 1349, 1362–66 (11th

Cir.1982). Instead the Fifth Circuit has continued to throw them all together under the heading of "the functional equivalent of a border."

**6.** This Eleventh Circuit case has been cited as authority by this Circuit. *See U.S. v. Niver,* 689 F.2d 520, 526 (5th Cir.1982), *citing U.S. v. Garcia,* 672 F.2d 1349 (11th Cir.1982).

ally since it had been in Customs custody and under its observation since arrival in this country. A bonded carrier shipped the sealed trailer to Bowman Transportation in New Orleans. It appears highly improbable that the 7800 pounds of marijuana were installed behind a false wall inside the trailer filled with wicker furniture during this period.

Finally, the Customs search was conducted at the earliest practicable point after crossing. New Orleans was designated by the consignee and appeared on the importation documents as the point of exit and Customs did not release the trailer until after it had been searched here. Thus, Bowman Transportation, as the trailer's arrival point, was the functional equivalent of a border with respect to this marijuana-laden trailer. Customs' search, therefore, was "reasonable," since it was a valid border search which required no warrant or suspicion.

The Fifth Circuit also allows searches at points in the interior, distant from international boundaries, under the doctrine of extended border searches. To qualify as such, three requirements must be met. The person or thing searched must have crossed the border.[7] When searched it must be in the same condition as when the border was crossed. And government agents must have reasonable suspicion to search. *Richards, supra,* 638 F.2d at 772.

Different tests have been applied in determining whether a border has been crossed. Some cases require a high degree of probability that the border has been crossed; others that the border crossing be proved by a preponderance of the evidence; and still others only that a reasonable suspicion exist that the border has been crossed. *Stone, supra,* 659 F.2d at 573. In this case the most strenuous test has been met. The Transportation Entry (Government Exhibit 2) showed that the

trailer's point of origin was Venezuela. The trailer was unladen from the ZULIA while in Customs custody. There is no doubt that the trailer crossed a border.

The government must also show, with reasonable certainty, that conditions remained unchanged from the time of the border crossing until the subsequent search. This requirement is met either by showing that the object searched was subject to constant surveillance from the time it crossed the border or that, under the circumstances, it is unlikely that the contraband was introduced during any breaks in surveillance. *Richards, supra,* 638 F.2d at 772.

In *U.S. v. Rafael Martinez,* 481 F.2d 214 (5th Cir.1973), *cert. denied,* 415 U.S. 931, 94 S.Ct. 1444, 39 L.Ed.2d 489 (1974), government agents followed defendant's car over 300 miles during a period of six days after crossing the border. There was a 35 minute break in the government agents' surveillance of the car immediately following the crossing. Still, the Court held that, in light of the fact that it took authorities over an hour to unload 628 pounds of marijuana, this break was insufficient to establish changed circumstances. 481 F.2d at 218–19.

In this case, both methods of proof are applicable. The trailer was continuously in the custody and control of Customs or its bonded carrier up to and through the time of the search. Moreover, it is unlikely that the contraband was introduced subsequent to crossing the border. The trailer contained almost 8000 pounds of marijuana hidden in a secret compartment behind a wall made of metal and wood paneling. Agents first had to remove a load of wicker furniture from the trailer to gain access to the wall. It would have been virtually impossible for someone to place the marijuana in this trailer while it was with Customs.

---

7. *But see U.S. v. Brom,* 542 F.2d 281–83 (5th Cir.1976) and *U.S. v. Flores,* 531 F.2d 222, 224 (5th Cir.1976), *cert. denied,* 429 U.S. 976, 97 S.Ct. 484, 50 L.Ed.2d 584 (1976) (searches held extended border searches although no proof that cars had crossed the border). These cases predate *Niver* and *Richards,* however.

Finally, since extended border searches are conducted away from the border and subsequent to entry, they entail a greater intrusion on legitimate expectations of privacy and are permitted only if supported by reasonable suspicion, supported by articulable facts, that the person or thing is involved in illegal activity such as smuggling. *Niver, supra,* 689 F.2d at 526; *Richards, supra,* 638 F.2d at 772.

In *Morales v. U.S.,* 378 F.2d 187 (5th Cir.1967) defendant Morales crossed the International Bridge at Laredo, Texas on foot. He was detained shortly and released. Under surveillance, Morales left the Customs office, followed a circuitous route and was picked up by an automobile which had crossed the border just previously. Since Morales' actions aroused suspicion, shortly thereafter the car was stopped and searched, and found to contain marijuana. The Fifth Circuit stated "[i]t would be clearly contrary to the policies that justify our border search laws to hold that once a person or vehicle has been examined, any further search must be based upon probable cause even where, as here, facts giving rise to reasonable suspicion come to light subsequent to the initial search [citations omitted]. Such a holding would throw an impediment in the path of Customs officers similar to those that the courts have rejected in holding that border searches cannot be restricted to the exact time or place of entry." 378 F.2d at 190.

In *U.S. v. Maggard,* 451 F.2d 502 (5th Cir.1971), *cert. denied,* 405 U.S. 1045, 92 S.Ct. 1030, 31 L.Ed.2d 587 (1972) Customs officers grew suspicious of a car as it passed through a checkpoint since the rear of the car was riding low. Although it did not use extended border search language, the Court held that a search of the car two miles past the checkpoint was a lawful border search. 451 F.2d at 504.

Fifth Circuit cases have also held that persons who have already passed through Customs can be searched when still in or near the airport if subsequent actions arouse suspicion. In *U.S. v. Walters,* 591 F.2d 1195 (5th Cir.1979), *cert. denied,* 442 U.S. 945, 99 S.Ct. 2892, 61 L.Ed.2d 317 (1979), a woman arrived at the Miami International Airport from Equador and, after a luggage search, passed through Customs. Fifty-five minutes later, after she had walked upstairs, bought a soda and a magazine, and returned to the airport lobby, Customs became suspicious of her, decided to search, and discovered cocaine taped to her body. The Fifth Circuit refused to draw "formalistic rules based on how long or how far a person has penetrated into the country," but decided to determine whether a search is a border search "based on whether the rationale for border searches is vindicated without impinging the rights of persons 'lawfully within the country....' " 591 F.2d at 1198. Impingement was measured by the degree to which the traveler had been assimilated into the "mainstream of domestic activity" and whether surveillance insured that the contraband had crossed the border. Since the defendant's activities were limited, "our border [was] protected with little more interference with domestic activity than would have been caused if appellant had never left the customs enclosure," *id.,* and the search was a lawful border search.

In *U.S. v. Ramos,* 645 F.2d 318 (5th Cir.1981), Ramos arrived in Miami from Colombia, and passed through Customs. After inspecting another passenger, Anderson, and discovering cocaine on her, agents gathered Customs Declaration cards from all passengers and examined them. Customs discovered that Ramos listed the same place as his home city as Anderson had and Anderson possessed a sheet of paper with Ramos' name on it. Inspectors then, having reason to suspect Ramos, went to a lobby near the airport hotel where they spotted him. Thirty minutes after he had passed through Customs and after he had already registered at his hotel, Ramos was searched and found to be carrying cocaine as well. The Fifth Circuit upheld the search as a border search. 645 F.2d at 321.

The thrust of these cases is that a Customs search made after an item

has crossed into the country is permissible if it remains under Customs scrutiny or has not been assimilated into domestic traffic. Although this case does not fall neatly into prior existing border search precedent, the same principles apply and the Fourth Amendment requirements have been met. Customs analyzed its profile when checking the documentation of the imported trailer. The Transportation Entry revealed a disproportionate freight charge relative to the value of the imported goods. This, along with the fact that Schultz was a first time importer, and was extremely anxious to receive his trailer, led Customs to have reasonable suspicion that the trailer was carrying contraband.

Nor did the search impinge upon the rights of persons lawfully in the country since the trailer had never been assimilated into the "mainstream of domestic activity." The trailer had never been released from Customs prior to the search. Nor had it had contact with any persons other than governmental officials. It was far less assimilated than Ms. Walters had been as she walked freely about the Miami Airport.

The trailer search at Bowman was, therefore, also permissible as an extended border search.

### III. THE "BEEPERS"

 The warrantless installation of a beeper on the outside of a vehicle does not violate the Fourth Amendment since the expectation of privacy is low in an automobile and the intrusiveness is not great. *U.S. v. Michael*, 645 F.2d 252, 257–58 (5th Cir.1981) (*en banc*), *cert. denied*, 454 U.S. 950, 102 S.Ct. 489, 70 L.Ed.2d 257, *reh. denied*, 454 U.S. 1117, 102 S.Ct. 692, 70 L.Ed.2d 654 (1981). Customs' installation of the direction finding device on the

underside of the trailer, thus, did not violate Bell's constitutional rights.

*Michael* did not consider whether warrantless beeper installation on the inside of a vehicle is permissible.[8] In *U.S. v. Butts*, 710 F.2d 1139, 1144 (5th Cir.1983), however, the Fifth Circuit employed *Michael's* "dual privacy and intrusiveness analysis" in considering this issue. After an extensive analysis of beeper jurisprudence, the Court stated that "a warrant based upon probable cause is required to install and maintain an electronic tracking device within the interior of a vehicle or other conveyance for an extended period of time. The Fourth Amendment demands nothing less." At 1150.

In *Butts* governmental officials had installed a beeper in an airplane pursuant to a properly executed warrant. A Magistrate extended the warrant's time limit and three days after the expiration of the second court-ordered removal date, the beeper was used to track the plane and lead officials to the discovery of evidence. The Fifth Circuit held that the use of the beeper subsequent to the removal date violated the Fourth Amendment. At 1151. Since the beeper signals were fruits of the constitutional violation, the Circuit affirmed the district court's suppression of the evidence. *Id.*

In the present case, there is no doubt that the entry and installation of the beeper on the inside of the trailer constituted a Fourth Amendment "search" and that, under normal circumstances, a warrant is required to effect such a search. However, since this case involves a border search, which requires neither probable cause nor a warrant, *Butts* is distinguishable. This Court is bound by border search jurispru-

---

8. Judge Tate in dissent stated for eight judges that the majority "admits that the defendant's reasonable expectation of privacy would have been violated if the beeper had been placed, by a momentary trespass of opening the door, in the *interior* ..." 645 F.2d at 262 (Tate, J., dissenting) (emphasis in original). Other cases have assumed that interior beeper installation constitutes a search. *See U.S. v. Cady*, 651 F.2d 290, 291 (5th Cir.1981), *cert. denied*, 455 U.S. 919, 102 S.Ct. 1274, 71 L.Ed.2d 459 (1982) (installation of a beeper which requires physical entry into a vehicle assumed to be a search); *U.S. v. Flynn*, 664 F.2d 1296, 1300, n. 9 (5th Cir.1982), *cert. denied*, 456 U.S. 930, 102 S.Ct. 1979, 72 L.Ed.2d 446 (1982) (noting that *Michael* suggested its holding was limited to cases where the attachment involved no physical intrusion).

dence and not by traditional Fourth Amendment warrant analysis.

In *Illinois v. Andreas,* —— U.S. ——, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983) the Supreme Court considered Fourth Amendment claims of a defendant who received a container shipped from India. The container was opened at the Chicago Airport and discovered to contain contraband. Customs agents subsequently resealed the container and effected a controlled delivery to the defendant. Later, they arrested the defendant, searched the shipment, and introduced the drugs as evidence at trial. The Supreme Court stated that once government agents have lawfully opened a package pursuant to a Customs search and have discovered illicit material, a defendant no longer has a protected privacy interest. 103 S.Ct. at 3323.

 Following *Andreas,* defendant Bell in this case lost any privacy interest he had in the trailer once government officials discovered the marijuana at Bowman. Since no legitimate expectation of privacy remained, the government was entitled to install a beeper to effect a controlled delivery. The installation of the cargo beacon on the false wall was, therefore, permissible under the Fourth Amendment.

In *U.S. v. Knotts,* —— U.S. ——, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983) the Supreme Court considered whether monitoring beeper signals constituted a constitutional violation. In that case government agents followed defendant to his drug laboratory by tracking the signals from a beeper consensually placed in a container of chloroform later sold to the defendant. The Court, noting that a person traveling on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another, held that beeper monitoring was neither a "search" nor a "seizure" within the Fourth Amendment. —— U.S. at ——, 103 S.Ct. at 1087. Government tracking of this beeper hidden on the trailer, likewise, would not have been a "search" or "seizure."

The government, thus, did not violate any Fourth Amendment interest by installing or monitoring either of the two "beepers."

## IV. SEARCH INCIDENT TO ARREST

### A. *Incident to Lawful Arrest*

 Warrantless searches are constitutionally permissible if incident to lawful arrest. *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); *Richards, supra,* 638 F.2d at 770. The scope of the search of a vehicle extends to all places where there is cause to believe that the objects of the search may be found. *U.S. v. Ross,* 456 U.S. 798, 824, 102 S.Ct. 2157, 2172, 72 L.Ed.2d 572 (1982). Governmental officials may also inspect a vehicle after impounding it in order to inventory its contents. *U.S. v. Orozco,* 715 F.2d 158, at 158, 161 (5th Cir. September 2, 1983); *U.S. v. Walden,* 707 F.2d 129, 131 (5th Cir.1983). In addition, Customs may make a search following a controlled delivery. *Andreas, supra,* —— U.S. at ——, 103 S.Ct. at 3323.

 Since the Customs search was constitutionally permissible under border search doctrine, government agents could search the trailer where they knew contraband would be found and the cab of the tractor where contraband or other evidence could be and, in fact, was found. The search following Bell's arrest was therefore lawful.

### B. *If the Arrest were Unlawful*

 If the initial entry to the trailer were not a valid Customs search, it would violate the Fourth Amendment since it was made without a warrant. *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Butts, supra,* 710 F.2d at 1148. The search, dog "sniff," discovery of marijuana, installation of the cargo beacon, unconsensual use of the beeper to monitor Bell's movements,[9] and eventual

---

**9.** *Compare U.S. v. Knotts,* —— U.S. ——, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983) (monitoring beeper

constitutionally permissible when beeper con-

arrest of the defendant would all have been tainted as fruits of the unlawful search. *U.S. v. Crews,* 445 U.S. 463, 470, 100 S.Ct. 1244, 1249, 63 L.Ed.2d 537 (1980); *Wong Sun v. U.S.,* 371 U.S. 471, 484–87, 83 S.Ct. 407, 415–17, 9 L.Ed.2d 441 (1963).

▪ The Supreme Court has allowed the constitutional "taint" to be "purged" in three situations. The lawless conduct may have an attenuated link with the tainted evidence. *Nardone v. U.S.,* 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939); *U.S. v. Cruz,* 581 F.2d 535, 538 (5th Cir. 1978) (*en banc*). The derivative evidence may have a source independent from the illegal activity. *Silverthorne Lumber Co. v. U.S.,* 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319 (1920); *U.S. v. Houltin,* 566 F.2d 1027, 1031 (5th Cir.1978), *cert. denied,* 439 U.S. 826, 99 S.Ct. 97, 58 L.Ed.2d 118 (1978). Or the evidence may have been inevitably discovered without the aid of the illegally obtained evidence.[10] *Brewer v. Williams,* 430 U.S. 387, 406–07, n. 12, 97 S.Ct. 1232, 1243, 51 L.Ed.2d 424 (1977); *U.S. v. Brookins,* 614 F.2d 1037, 1042 & n. 2 (5th Cir.1980).

▪ To fit within the "inevitable discovery" exception, the government must show with a reasonable probability that the police would have uncovered the derivative evidence apart from the illegal actions. *U.S. v. Miller,* 666 F.2d 991, 996–97 (5th Cir.1982), *cert. denied,* 456 U.S. 964, 102 S.Ct. 2043, 2044, 72 L.Ed.2d 489 (1982); *Brookins, supra,* 614 F.2d at 1048. To fulfill this requirement the police must show that when the illegality occurred they possessed and were actively pursuing evidence or leads that would have led to dis-

covery of the evidence.[11] In addition, the Court must find that reasonable probability of discovery existed based on this showing and the record generally.[12] *Brookins, supra,* 614 F.2d at 1048.

▪ In this case, Customs, prior to the search at Bowman, was alerted to the probable presence of contraband by the suspicious circumstances of Schultz's importation. Thus, they possessed leads that would have led them to investigate the trailer further, to see Bell use the frequency detector, and to search the vehicle at a later date. Moreover, had the Bowman search not taken place, there is reasonable probability that a later search would have discovered the hidden marijuana. Thus, the evidence would have been "inevitably discovered" and, even had the Bowman search been illegal, the evidence would not be suppressed since this "taint" would have been "purged."

## CONCLUSION

Defendant Strmel has no standing to claim a Fourth Amendment expectation of privacy in the evidence defendants seek to suppress. The search of the trailer at Bowman Transportation was within the parameters of the Fourth Amendment since it was a lawful border search conducted by Customs agents. Even had it been illegal, the evidence obtained during the search at the Union 76 truck stop would not be suppressed since it would inevitably have been discovered.

For the foregoing reasons, the Motion to Suppress is DENIED with respect to both defendants.

sensually placed by seller in goods sold to defendant).

**10.** The Fifth Circuit rejected the inevitable discovery rule prior to *Brewer v. Williams. See U.S. v. Castellana,* 488 F.2d 65, 68 (5th Cir.1974), *aff'd in part, rev'd in part,* 500 F.2d 325 (5th Cir.1974) (*en banc*). In *U.S. v. Brookins,* the Circuit held that the *Castellana* view was overruled. 614 F.2d 1037, 1045–46 (5th Cir.1980).

**11.** This requirement was waived in *U.S. v. Miller* under the particular facts of that case. 666 F.2d

991, 997 (5th Cir.), *cert. denied,* 456 U.S. 964, 102 S.Ct. 2043, 2044, 72 L.Ed.2d 489 (1982).

**12.** There is some language in *Brookins* to the effect that its holding is limited to inevitable discovery of voluntary witnesses. 614 F.2d at 1042, n. 2. *See Miller,* 666 F.2d at 997. However, the Circuit has not read *Brookins* so restrictively. *See U.S. v. Shaw,* 701 F.2d 367, 379, n. 6 (5th Cir.1983) ("inevitable discovery" of rifle and shells in truck).