**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Vidal AGUIRRE–VALENZUELA,
Defendant-Appellant.**

**No. 82–1269.**

United States Court of Appeals,
Fifth Circuit.

Feb. 24, 1983.

Robert Ramos, Asst. Federal Public Defender, El Paso, Tex., for defendant-appellant.

Sidney Powell, Asst. U.S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before WILLIAMS and JOLLY, Circuit Judges, and WILL\*, District Judge.

PER CURIAM:

This appeal follows a May 1982 conviction, after non-jury trial,[1] for unlawful entry into the United States in violation of 8 U.S.C. § 1325. The appellant was sentenced to two years under the provisions of 18 U.S.C. § 4205(b)(2). We believe that the district court properly determined that United States Border Patrol agents reasonably suspected that the car in which the appellant was riding contained persons illegally entering the country and that the border stop was constitutional. This comprises the only issue on appeal, and we therefore affirm.

I.

Presidio, Texas, lies very close to the United States-Mexican border on the Rio

---

\* District Judge for the Northern District of Illinois, sitting by designation.

1. Appellant waived trial by jury.

Grande River in southwest Texas. State Highway FM 170 (a "Farm-to-Market" highway), which connects Presidio with other towns along the border, including Ruidosa, Texas, is a two-lane highway which runs northwest-to-southeast and which fairly parallels the Rio Grande. At some points FM 170 comes within 200 yards of the river and at its greatest distance is one-half mile from the river. The river is visible from FM 170. Immediately across the Rio Grande is the Mexican town of Ojinaga in the state of Chihuahua, Mexico.

Another road, a dirt road, runs north-south connecting the banks of the Rio Grande to FM 170. The exact length of the dirt road is not known,[2] although there was testimony that it "snakes around a little bit." The dirt road intersects FM 170 approximately twenty-eight miles west of Presidio. Upon hitting FM 170 one can either turn left, west, to Ruidosa, or turn right, east, to Presidio.

The dirt road is not an authorized border entry point; no fence or other physical restriction exists where the road comes down to the river. A bona fide crossing point is nearby, although there is no inspection guard at that point either. A sign directs those who cross there to report to an inspection station some miles away. Apparently this latter point constitutes an "honor system" entry point.

The depth of the river at this pertinent point was not revealed in the record. There is no bridge at this point or at any nearby point, however.

Sensors are located on the dirt road, approximately one hundred yards from the river, and on FM 170, approximately ten miles from where the dirt road intersects the highway, toward Presidio.[3] Although

there was some inconsistency in the testimony, the two sensors are at most ten and one-half miles apart.

At approximately 8:30 p.m. on March 1, 1982, two United States Border Patrol agents, Wayne Weimers and Lawrence Beck, were patrolling in a marked Border Patrol vehicle on FM 170 when they were alerted by the Patrol Sector Headquarters at Marfa, Texas, that the sensor on the dirt road had been triggered. The agents parked their car, with its lights off, perpendicular to FM 170 about three miles west of Presidio, and waited. The area where the agents were parked was devoid of any houses or any other buildings. No lights illuminated the dark highway.

Within fifteen minutes after the first sensor "hit" was reported, the sensor on FM 170 was triggered, and the agents were notified. The hit indicated that the vehicle which triggered the sensor was heading east toward the agents. Within approximately ten minutes of the second sensor hit, a 1969 brown Chevrolet headed east on FM 170 passed the agents. As the Chevrolet passed, the agents turned on their headlights and saw that there were four or five people in the car. The agents followed the car for about five minutes, observed that it travelled "erratically," and stopped the car. Upon questioning the occupants, the agents determined that all five of them were illegal aliens. The appellant was arrested and taken to Presidio.

## II.

At the Motion to Suppress hearing held on April 26, 1982, the appellant argued that the agents lacked sufficient reason to suspect that the car in which he was riding was the same car which had triggered the

---

**2.** Inexplicably, no one bothered to measure the exact distances involved here. As discussed below, this is the most pertinent factual issue involved. As the Assistant United States Attorney who argued before this court candidly admitted, the record is wanting in several respects.

**3.** At oral argument it was revealed for the first time that another sensor was located on FM

170 west of the intersection with the dirt road, toward Ruidosa. At the time of the events herein, however, that sensor was broken and had been taken in for repairs.

The sensors involved were "loop-types," looped across the road. The sensors indicate the weight of a vehicle passing over them and also indicate the direction in which it is travelling.

first sensor. The appellant concedes that had the agents seen a car on the dirt road leading to FM 170 they would have had reasonable cause to suspect illegal entry and to have stopped that car. Because the car which triggered the first sensor *could* have turned left at FM 170 and headed west, however, appellant contends that the agents acted unlawfully in stopping the car in which the appellant was riding.

The appellant asks us to impose a higher standard on the border patrol agents than the Constitution requires. As the Supreme Court stated in *United States v. Brignoni-Ponce*, 422 U.S. 873, 884, 95 S.Ct. 2574, 2582, 45 L.Ed.2d 607 (1975), the agents must have known of "specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." In short, the agents must have a *reasonable suspicion*—not a *certain knowledge*—in order to justify a stop.

In *Brignoni* the Court listed a number of relevant facts from which rational inferences can be drawn. Among other facts cited by the Court are the proximity to the border, traffic patterns in the area, experience with "alien traffic," the driver's behavior and characteristics of the vehicle itself.

Many of these facts were present here. The two agents—one with seven and one-half years' experience, all in the Presidio area, and one with four years' experience, all in the Presidio area—did not see a single car other than the appellant's. Although the record is less than perfect in the recitation of the "time-space/continuum" involved here, the timing of the sensor alerts and the arrival of the appellant's car at the agents' location certainly were coincident enough to allow a reasonable inference that this was the car which had hit the sensors. The agents saw that the car was occupied by four or five persons and that the car was being driven erratically.[4]

All of this occurred in significant proximity to the border, away from any controlled checkpoint. Viewing "the whole picture," *United States v. Cortez*, 449 U.S. 411, 421, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981), we agree with the lower court that the agents had a reasonable, justifiable suspicion that illegal entry had occurred and that the car which passed them on FM 170 was the motor operandus for that illegal entry.

The judgment of the lower court is therefore affirmed.

AFFIRMED.

---

4. We are not greatly influenced by the "erratic" driving. Such "erratic" behavior is probably not unusual when one—law-abiding or not—suddenly finds oneself being followed on a dark road away from any signs of civilization.