**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Jose DELGADO, Defendant-Appellant.**

**No. 86-1639
Summary Calendar**

United States Court of Appeals,
Fifth Circuit.

Feb. 6, 1987.

Robert Ramos, El Paso, Tex., for defendant-appellant.

Mrs. Helen M. Eversberg, U.S. Atty., El Paso, Tex., Sidney Powell, Thomas J. McHugh, Asst. U.S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before CLARK, Chief Judge, GARWOOD and HILL, Circuit Judges.

ROBERT MADDEN HILL, Circuit Judge:

Defendant Jose Delgado appeals his convictions on various drug-related charges and asserts that the district court improperly denied his motion to suppress certain evidence. We disagree with Delgado and affirm his convictions.

**I.**

The events involved in this appeal originated in a remote farming area near Tornillo, Texas, east of El Paso, Texas. In this particular area, the Rio Grande River runs generally east and west and constitutes the international boundary between the United States and Mexico. A state highway designated Texas Highway 20 runs east and west and is located approximately one mile north of the Rio Grande. Between the highway on the north and the river on the south are a number of farms, including the Ivey and Allison farms.

James Marchant is a Customs Investigator with the United States Customs Service. He has been stationed in El Paso, Texas, since 1974 and has conducted extensive investigations in the farming area near Tornillo. In September 1985 Marchant was assigned to the newly formed Tactical Enforcement Unit to investigate drug smuggling along the Rio Grande from El Paso east for approximately 60 miles. Marchant knows this area as one in which extensive drug smuggling activity takes place. Although the area is located only a few miles east of El Paso and its border city Juarez, Mexico, the land on the United States side of the border consists of sparsely populated farmland. The Mexican side of the border, although also sparsely populated, is served by a paved highway that runs adjacent and parallel to the river for almost fifty miles east of Juarez.

For several years Marchant received information from a confidential informant that the Ivey farm was frequently used by Mexicans to smuggle drugs into the United States. The Ivey farm is located on the Rio Grande and in a remote area. The remoteness and unusually good access provided to this area by the paved highway on the Mexican side of the border enhance the area's popularity with drug smugglers. In Marchant's experience, smugglers usually brought their contraband across the border and to this area shortly after nightfall, thereby making it easier for the smugglers to flee if detected and more difficult for the Customs agents to conduct effective surveillance. Marchant testified that he was quite familiar with this area because he drives the farm roads often, knows the local vehicles, and knows the local residents of the six houses located there.

In mid-March 1986 Marchant received information from a confidential informant that a Mexican drug smuggling organization headed by Abel Ramirez, a Mexican national, was using a specific crossing on the Ivey farm to smuggle marijuana into the United States. The informant specified

that Ramirez's people were crossing the border at a well-built foot bridge used to gauge water in the Fort Hancock feeder canal. In response to this information, Marchant's unit established general surveillance of the Ivey farm area.

Late on the afternoon of April 2 the same informant called Marchant and told him that Ramirez had a convoy of vehicles leaving Juarez traveling on the Mexican highway downriver to the crossing at the headgate on the Ivey ranch. The informant specified that the vehicles were loaded with marijuana which was going to be brought into the United States at nightfall. The informant also told Marchant to watch for a large enclosed truck capable of carrying tonnage, that the loading-unloading operation would be concluded shortly after dark, and that the load vehicles would clear the area before 9 p.m. The informant indicated that various vehicles were going to travel along the highway on the Mexican side that paralleled the river boundary and that the alleged marijuana was to be off-loaded from one of those vehicles and smuggled across the bridge on foot to the American side. The confidential source told Marchant that there would be a vehicle somewhere on the American side that would ultimately receive the smuggled marijuana. Marchant believed that this information was accurate because this informant had previously provided him with information on numerous occasions that had resulted in significant seizures, arrests, and convictions of drug smugglers.

Marchant and another Customs investigator, David Arel, established surveillance of the Ivey farm area in their unmarked units on April 2 at approximately 7:20 p.m. Marchant parked near the dirt road leading from the crossing point specified by the informant. Marchant and Arel were in positions such that any traffic not originating from the border area had to pass at least one of them. At approximately 8 p.m. Marchant saw a large yellow enclosed truck, approximately 2-½ to 3 tons, driving away from the border on the road out of the Ivey ranch. Arel reported that the truck had not come from his direction on Texas 20 at the other end of the farm. Marchant therefore believed that the truck had come from the border area.

Marchant followed the truck as it drove towards Tornillo at approximately 45 miles an hour. Subsequently, a sedan pulled in behind Marchant and passed him to travel with the truck. Based on his experience Marchant believed that the sedan was a "heat vehicle," traveling in tandem with the truck to help insure that it reached its destination. Arel confirmed that the second vehicle had not passed him; therefore, Marchant believed that it too had come from the border area.

Marchant concluded that the truck, which he had never seen before in and around the Ivey farm, was the load vehicle. Marchant also noticed that the truck had recently been painted yellow to cover numbers and other identifying markings that could vaguely be seen under the paint. The description of the truck, the time of its appearance, and its location matched the information provided by Marchant's reliable informant in every material respect. Based on these facts, and his experience and knowledge of the area, Marchant believed that he had reasonable suspicion to believe that the truck had come from the border and was loaded with marijuana as the informant had detailed.

Once Arel arrived to provide backup, Marchant stopped the truck on Interstate 10. As soon as the truck was stopped, the driver stepped down. Marchant recognized Delgado, whom he had known previously. Delgado was the sole person in the truck. Marchant was also able to detect the odor of marijuana emanating from the truck. Marchant walked to the rear of the truck and saw that the tailgate was not completely closed. Through a three- or four-inch wide gap at the bottom, Marchant could see that the contents of the truck consisted of cardboard boxes sealed with tape. Marchant testified that the odor of marijuana was "overpowering."

Marchant and Arel arrested Delgado and advised him of his *Miranda* rights. Delga-

do agreed to waive those rights and talk. After initially denying knowledge of the contents of the truck, Delgado admitted driving his truck to the river-crossing on the Ivey farm property where approximately twenty Mexicans carried 153 bundles of marijuana across the foot bridge from Mexico into the United States. Delgado then agreed to cooperate with the investigators by driving the truck into El Paso and parking it at a prearranged location. The truck was parked at a car wash near Interstate 10 and Giles Road with the keys in it. Although surveillance was maintained for several hours, no one attempted to pick it up. The truck was then removed to the Customs offices where Delgado executed a written consent to search. It was only then that the truck was actually opened and its contents inspected. Those contents turned out to be marijuana weighing approximately 4460 pounds.

Delgado was charged with conspiracy to import in excess of 50 kilograms of marijuana and its importation, in violation of 21 U.S.C. §§ 963, 952(a) and 960(a)(1), and conspiracy to possess marijuana and its possession, in violation of 21 U.S.C. §§ 846 and 841(a)(1). Prior to trial, Delgado filed a motion to suppress the marijuana found on the truck, claiming that Marchant and Arel did not have probable cause to stop the truck. The district court denied Delgado's motion but did not reach the question of probable cause. Instead, the district court held that Marchant and Arel were justified in carrying out an "extended border search," which does not require probable cause to be valid.[1] Delgado then entered conditional pleas of guilty to all counts, reserving in writing his right to appeal the district court's order denying his motion to suppress, pursuant to Fed.R.Crim.P. 11(a)(2). He was sentenced to concurrent terms of imprisonment of ten years on each count and concurrent ten year special parole terms on the substantive counts. The only issue on appeal is whether the district court erred in denying Delgado's motion to suppress.

## II.

Warrantless searches and seizures are unreasonable under the fourth amendment except when they fall within a few narrowly defined exceptions. *Coolidge v. New Hampshire*, 403 U.S. 443, 454–55, 91 S.Ct. 2022, 2031–32, 29 L.Ed.2d 564 (1971). One of these exceptions is the warrantless search at the international border, which is justified on the basis of a country's historical right to protect itself by examining people and property entering the country. *United States v. Ramsey*, 431 U.S. 606, 616, 97 S.Ct. 1972, 1978, 52 L.Ed.2d 617 (1977). Furthermore, government officials do not need any suspicion to justify a border search. *United States v. Sandler*, 644 F.2d 1163, 1165 (5th Cir.1981) (en banc).

The Supreme Court has emphasized a distinction between searches conducted at the border or its "functional equivalents," and searches at other points within the country ("extended border searches"). The former may be made without probable cause or a warrant. *United States v. Ortiz*, 422 U.S. 891, 897, 95 S.Ct. 2585, 2589, 45 L.Ed.2d 625 (1975); *United States v. Brignoni-Ponce*, 422 U.S. 873, 884, 95 S.Ct. 2574, 2581–82, 45 L.Ed.2d 607 (1975); *Almeida-Sanchez v. United States*, 413 U.S. 266, 272–74, 93 S.Ct. 2535, 2539–40, 37 L.Ed.2d 596 (1973). An "extended border search," however, must be supported by at least a reasonable suspicion of criminal activity. *United States v. Barbin*, 743 F.2d 256, 261 (5th Cir.1984); *United States v. Richards*, 638 F.2d 765, 772 (5th Cir.), *cert. denied*, 454 U.S. 1097, 102 S.Ct. 669, 70 L.Ed.2d 638 (1981). Regardless of the type of search involved, the fact that a border crossing occurred must be demonstrated.

---

1. The district court first stated that Marchant had sufficient information to carry out a "border search" but then went on to hold that Marchant met the requirements of an "extended border search." As we explain below, there is a difference between the criteria that must be shown for these two types of searches. Since most of the district court's opinion analyzes the "extended border search" rationale, which places greater burdens on the government, our opinion examines whether an "extended border search" was properly performed.

As we stated in *United States v. Niver*, 689 F.2d 520 (5th Cir.1982):

> We have generally required a showing beyond a "reasonable certainty" that the entity searched has crossed the international border, *United States v. Ivey*, 546 F.2d 139 (5th Cir.1977), or "a high degree of probability that a border crossing took place." *United States v. Brennan*, 538 F.2d 711, 715 (5th Cir.1976), *cert. denied*, 429 U.S. 1092, 97 S.Ct. 1104, 51 L.Ed.2d 538 (1977). The standard of "reasonable certainty" has been described by the Ninth Circuit as something more than probable cause, but less than beyond a reasonable doubt. *United States v. Driscoll*, 632 F.2d 737, 739 (9th Cir. 1980).[2]

*Id.* at 526. In *United States v. Fogelman*, 586 F.2d 337 (5th Cir.1978), we stated:

> The legality as a "border search" not made in the vicinity of the border is tested by the totality of the surrounding circumstances, including the elapsed time and distance as well as the manner and extent of surveyance [sic]. These factors must be such as to convince the fact-finder with reasonable certainty that there has been no change of condition of the trucks from the time they were loaded at the border until they were stopped, and that whatever was in the trucks when they were searched was in them when they left the border.

*Id.* at 343. *See also Niver*, 689 F.2d at 527; *Richards*, 638 F.2d at 772.

Delgado's only contention is that the warrantless stop and search of his truck cannot be considered an "extended border search" because his truck had not crossed the border. We disagree.

In order to satisfy the requirement that a border crossing occur, the vehicle that is searched does not have to be the object that crossed the border. In *Fogelman* the defendants brought marijuana into this country on a boat coming from international waters. Government agents watched trucks being loaded with marijuana. Subsequently, the trucks were stopped and searched. Although the trucks themselves had not crossed the border, we upheld the actions of the government agents as an "extended border search" because the contraband had crossed the border. *Fogelman*, 586 F.2d at 343–45. *See also Johnson*, 588 F.2d at 154 n. 15 (discussing *Fogelman*).

■ In this case, as in *Fogelman*, there is sufficient evidence to show beyond a "reasonable certainty" that the contraband had crossed the border, and that no change of condition occurred in the truck or its cargo from the time they left the border until the time the truck was searched. Marchant had received a detailed tip from a confidential informant who had provided reliable information in the past. The informant told Marchant that a large quantity of marijuana would be smuggled across the border at the foot bridge on the Ivey farm. The area had often been used in the past to

---

2. We recognize that our cases have not been consistent in discussing whether or not a border crossing must occur to justify an "extended border search." *See United States v. Richards*, 638 F.2d 765, 771 (5th Cir.), *cert. denied*, 454 U.S. 1097, 102 S.Ct. 669, 70 L.Ed.2d 638 (1981). In *United States v. Steinkoenig*, 487 F.2d 225, 227–28 (5th Cir.1973), we stated that "a border crossing is not the *sine qua non* of a valid border search," and that it was sufficient if the object of the search has a "nexus" with the border. In *United States v. Fogelman*, 586 F.2d 337, 343 (5th Cir.1978), we repeated the language from *Steinkoenig*. In *United States v. Johnson*, 588 F.2d 147, 154 n. 13 (5th Cir.1979), however, we noted that the statements in *Steinkoenig* were dicta in light of the Supreme Court's decision in *Almeida-Sanchez v. United States*, 413 U.S. 266,

93 S.Ct. 2535, 37 L.Ed.2d 596 (1973). The panel in *Johnson* interpreted the statement in *Fogelman* as meaning that officers need not actually observe a border crossing in order for their search to be reasonable; the fact that a border crossing has occurred may be inferred by circumstantial evidence. *Johnson*, 588 F.2d at 154.

Our subsequent cases like *Niver* have made it clear, however, that an actual border crossing must be demonstrated to justify either a "functional equivalent of the border" search or an "extended border search." We believe that *Niver* represents the better reasoned view of our cases and that it is more consistent with Supreme Court precedent such as *Almeida-Sanchez*. Consequently, we adhere to *Niver* as well as the limiting interpretation of *Fogelman* made by the *Johnson* panel.

smuggle illegal drugs into the United States. Furthermore, from what he saw, as well as from the information received from investigator Arel, Marchant knew beyond a "reasonable certainty" that the truck which passed his surveillance point emerged from the Ivey farm. The time and place that the truck emerged also coincided with the information supplied by the confidential informant. Under these circumstances, we hold that the warrantless stop and search of Delgado's vehicle was proper under the "extended border search" exception.[3]

### III.

For the reasons stated above, the district court properly denied the motion to suppress. Accordingly, Delgado's convictions are AFFIRMED.

---

**3.** In light of our holding, we do not address the government's contention that there are alterna-tive grounds to justify Marchant's stop.