For the foregoing reasons, the judgment of the district court is AFFIRMED.

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Gilbert ESPINOZA–SEANEZ, Ernesto
Espinoza–Seanez and Raul
Lazarin–Becerra, Defendants–Appellants.**

**No. 88–1026.**

United States Court of Appeals,
Fifth Circuit.

Dec. 15, 1988.
Rehearing and Rehearing En Banc
Denied Feb. 1, 1989.

we would not in any event find reversible error

in the bankruptcy court's holding.

**528**

Charles Louis Roberts, El Paso, Tex., for Gilbert Ernesto Espinoza–Seanez.

Robert Ramos, El Paso, Tex., for Lazarin–Becerra.

LeRoy Morgan Jahn, Asst. U.S. Atty., San Antonio, Tex., for U.S.

Before GEE, SNEED * and WILLIAMS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

The appellants, Gilbert Espinoza–Seanez, Ernesto Espinoza–Seanez and Raul Lazarin–Becerra (hereafter Gilbert, Ernesto, and Lazarin, respectively) were found guilty of conspiracy to possess marihuana with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 846(1). Gilbert was also found guilty of the substantive offense of possession. Gilbert received concurrent sentences of five years for each count, a three-year term of supervised release for the offense of possession, and $100 in assessments pursuant to 18 U.S.C. § 3013(a); Ernesto and Lazarin each received five year sentences and special assessments of $50 pursuant to 18 U.S.C. § 3013(a). They appeal their convictions.

*Facts*

On the morning of August 19, 1987, at 5:30 a.m. John Jennings, a border patrol helicopter pilot, was informed that a metal detection device located on a dirt road roughly two and one-half miles from the border between Mexico and New Mexico had been activated. The sensor was near an open concrete structure called the "pillbox" located at the intersection of two roads. One of those roads comes from the place known as the Burchfield Gate, an unlocked gate in a fence that runs along the international border separating the state of New Mexico from Mexico. A dirt road runs through the gate and north for roughly 2½ miles, where it eventually intersects with a crushed gravel and dirt road known as the Old Strauss Road.

Throughout the months of July and August, 1987, the border patrol had been flying over this area and had observed numerous tracks from foot traffic, cars, and trucks. At some point during July and August the border patrol observed tracks leading to and from the border and the pillbox. On further investigation, agents discovered pieces of plastic, other packaging materials and rope in the pillbox. These packaging materials and the increased activity made them suspicious that illicit border traffic was taking place. On the 18th of August the border patrol investigated the area between the pillbox and the Burchfield Gate, and used helicopters to blow sand into old tracks so that they could later determine if any fresh tracks would appear.

When Jennings was informed of the sensory "hit" in the area on August 19th, he had already observed a car driving toward the pillbox area from the direction of El Paso. Jennings continued aerial surveillance around the pillbox. He saw a vehicle stop, remain parked with its lights off for roughly five minutes, and then turn around and head back east towards El Paso.

At 5:50 a.m. Jennings called for help in tracking the vehicle and a radio dispatcher called another pilot, Pilot Loren Nichols.

---

* Circuit Judge of the Ninth Circuit, sitting by designation.

Nichols was airborne in his helicopter by 5:55 and flew west along the international border. During his flight he was informed by Jennings of the previous events and was guided by Jennings to the vehicle. Jennings had been following the vehicle from the time he first spotted it arriving at the pillbox until 6:15 a.m. at which point Nichols took over the aerial surveillance. Nichols called in requesting ground surveillance, and identified the automobile by color and as a sedan with only one person in it. Border patrol agents waited near Santa Teresa, New Mexico and began to follow the vehicle after Nichols identified it. Both Nichols and the ground units followed the vehicle through Santa Teresa onto Interstate Highway 10 East and into El Paso.

In the meantime, Jennings and another helicopter pilot landed in the Burchfield Gate area. They discovered four or five sets of footprints, fresh since the Border Patrol's investigation of the previous day, coming from the Mexican border to the pillbox area. They relayed the information of the apparent border crossing on to Jennings. Jennings informed the ground surveilance units and requested that they stop the suspect vehicle.

The stop was made at roughly 7:30 a.m., on I–10 one mile east of Sunland Park, in El Paso. Patrol Agent Javier Magdaleno testified that prior to the stop he saw the suspect vehicle riding very low in the back, indicating that it was carrying a heavy load in the trunk. The vehicle was an early 1970's model blue/gray Pontiac sedan. Agent Magdaleno also saw that there was a spare tire inside the vehicle directly behind the front seat. When asked where he was coming from, the driver, appellant Gilbert Espinoza–Seanez, said "Anapra, New Mexico." The border agents knew that to be false, because they had had Gilbert's car under direct surveillance for the past two hours. Furthermore, the border agents testified that Gilbert was nervous and sweating profusely.

The agents asked Gilbert to step out of the car, and then asked him if he was carrying anything in the trunk. At this point Gilbert asked if they had a search warrant. The border agents then phoned their supervisors to request advice, and were told to "stay clear of the vehicle." After the agent who had phoned the Border Patrol Headquarters came back, he handcuffed Gilbert, told him he was under arrest, and read him his Miranda rights. After having been arrested, Gilbert stated, "Go ahead and open it. It's in there. Go ahead and open it." The agents asked Gilbert several times if he was certain that he wanted to authorize a search of the car trunk, and he replied affirmatively each time. This conversation occurred roughly 10 minutes after the car was stopped. Agents stated they were concerned that there might have been aliens in the trunk, and if so they wanted to let them out. After he gave his consent, the agents opened up the trunk without a search warrant. They found 225 pounds of marihuana.

Gilbert was taken to the Border Patrol Headquarters. He agreed to cooperate with the DEA by making a prearranged drop off of the marihuana. He went with DEA agent Garcia, one Customs Agent, and several Border Patrol Agents to a 7–11 store where he was scheduled to have turned over the car containing the marihuana.[1] Although the record is unclear on this point, apparently Gilbert's contact was not at the convenience store. Gilbert proceeded to make a phone call. The name of the person he called was not disclosed at the trial. Gilbert then went to the El Senorial Bar in El Paso, where Gilbert's brother, Ernesto, met him at 11:30 a.m. Ernesto was arrested. When questioned as to whether he knew that the Pontiac contained a load of marihuana, Ernesto responded that he did and that he was there to pick it up. He also indicated that he knew of the plans to transport the marihuana to El Paso.

---

**1.** The car was owned by Gilbert's younger brother. Hereafter we will refer to it as the "load vehicle," or "the Pontiac."

Ernesto also agreed to cooperate with the DEA and told the agents that he was supposed to make a phone call and then leave the car at an El Paso restaurant. After the call Ernesto and Agent Garcia drove to the La Rosita Cafe and parked in the parking lot. Roughly 40 minutes later, Lazarin drove into the parking lot and parked his car several yards from the Pontiac. There were also two other men in the car. One of them, an unidentified Hispanic male, got out of Lazarin's car, quickly got into the load vehicle and drove away before the agents could stop him. After this occurred, the agents arrested Lazarin and coindictee Jose Gandarilla–Castro, the third man in the car. In Lazarin's car was a mobile telephone and Lazarin himself had $1,760 on his person. Ernesto also had approximately $1,700 in his possession at the time of his arrest.

The three defendants were tried and convicted in the same proceeding for conspiracy to possess marihuana for distribution. Further, Gilbert was also convicted for the substantive crime of possession. There are four issues raised on appeal: (1) Gilbert contends that the marihuana should have been suppressed as evidence because the search of the vehicle was in violation of the Fourth Amendment and because his arrest was without probable cause. (2) Ernesto argues that the confession of Gilbert was used to convict him and because Gilbert never took the stand he was denied his Sixth Amendment right to confront the witness against him. Lazarin makes an identical argument with respect to Ernesto's confession. Both Ernesto and Lazarin claim that the use of the confessions was in violation of the Supreme Court's ruling in *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). During the trial counsel for both Ernesto and Lazarin moved for trial severance on *Bruton* grounds, and both now claim that the refusal to grant severance was reversible error. (3) Ernesto claims that the district court committed reversible error because it failed to hold a hearing on the voluntariness of his admissions. (4) Lazarin claims that there is insufficient evidence to convict

him of the conspiracy charge. We address each of these contentions in turn.

### I. *The Search of the Automobile and Gilbert's Arrest.*

Warrantless searches must fall within one or more well defined exceptions or they are considered unreasonable and in violation of the Fourth Amendment. *Coolidge v. New Hampshire*, 403 U.S. 443, 454–55, 91 S.Ct. 2022, 2031–32, 29 L.Ed.2d 564 (1971). We find that the search in this case falls within a valid exception, and we uphold the district court's order denying Gilbert's motion to suppress the evidence. The search of the Pontiac can be justified as an extended border search or as an automobile search with probable cause. Because we find justification for the search of the automobile on either of these grounds it is not necessary to consider whether Gilbert voluntarily consented to the search. Also Gilbert's arrest without warrant can be justified as one for which there was probable cause.

### A. *The Extended Border Search Justification.*

■ The United States Supreme Court has held that "[e]xcept at the border and its functional equivalents, officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the Country." *United States v. Brignoni–Ponce*, 422 U.S. 873, 884, 95 S.Ct. 2574, 2582, 45 L.Ed.2d 607 (1975). *See also United States v. Ortiz*, 422 U.S. 891, 896–97, 95 S.Ct. 2585, 2589, 45 L.Ed.2d 623 (1975). The same requirement must be met if the vehicle contains contraband rather than illegal aliens. *United States v. Cortez*, 449 U.S. 411, 422, 101 S.Ct. 690, 697, 66 L.Ed.2d 621 (1981) (referring to reasonable suspicion of "criminal activity" generally rather than transportation of illegal aliens specifically). An officer at the border or its functional equivalent may search any vehicle without probable cause or a warrant for reasons relating to sovereignty; the United States as a sovereign

state must be able to control what comes and goes through its international borders.

■ A different standard applies for an "extended border search." For a police search to qualify as an extended border search three factors must be demonstrated. First, there must be the showing of "a reasonable certainty" or "a high degree of probability" that a border crossing has occurred. *United States v. Delgado,* 810 F.2d 480, 484 (5th Cir.1987); *United States v. Niver,* 689 F.2d 520, 526 (5th Cir.1982); *United States v. Pena–Cantu,* 639 F.2d 1228, 1229 (5th Cir.1981). Reasonable certainty is a standard which requires more than probable cause, but less than proof beyond a reasonable doubt. *United States v. Driscoll,* 632 F.2d 737, 739 (9th Cir.1980). This standard is the established law as applied by the Fifth Circuit. *See Niver,* 689 F.2d at 526 and *Delgado,* 810 F.2d at 484. Second, to justify the application of the extended border search doctrine, the court must also be convinced with reasonable certainty that no change in the condition of the vehicles being inspected has occurred "from the time they were loaded at the border until they were stopped, and that whatever was in the [vehicles] when they were searched was in them when they left the border." *United States v. Fogelman,* 586 F.2d 337 (5th Cir.1978). *See also United States v. Barbin,* 743 F.2d 256, 261 (5th Cir.1984). Finally, there must be reasonable suspicion that criminal activity is occurring. Suspicion of criminal activity may arise from:

(1) characteristics of the area in which the vehicle is encountered; (2) proximity to the border; (3) usual patterns of traffic on the road; (4) previous experience with alien traffic; (5) information about recent illegal crossings in the area; (6) behavior of the driver; (7) appearance of the vehicle; and (8) number, appearance or behavior of the passengers. *United States v. Brignonie-Ponce,* supra, 422 U.S. at 885, 95 S.Ct. at 2582. Reasonable suspicion is not limited to any or all of these factors. Instead "[e]ach case must turn on the totality of the particular circumstances" and "the officer is entitled to assess the facts in light of his experience in detecting illegal entry and smuggling."

*United States v. Melendez–Gonzalez,* 727 F.2d 407, 410–11 (5th Cir.1984).

■ The facts of this case satisfy the three requirements for an extended border search. Before the border agents stopped the car, they had observed the Pontiac go to an isolated area two miles from the border where they had suspicion that smuggling activity was taking place early in the morning. The car stopped there for five minutes, then turned around and headed immediately back in the direction from which it had come. Upon investigating the area immediately after the car had left, the border patrol found fresh sets of footprints which had been made since the previous day. The footprints went to and from the border to the place where the car had stopped. Given the location, time, and physical evidence, there was a "reasonable certainty" or a "high probability" that a border crossing had occurred, although not necessarily proof beyond a reasonable doubt.

The second requirement that there be no substantive change in the vehicle from the time it left the border is also satisfied. From the time the border patrol observed Gilbert's vehicle by the pillbox to the time he was apprehended the car was trailed by both helicopters and ground agents. It never left their sight.

The third requirement of reasonable suspicion of criminal activity is also satisfied. At least five of the eight characteristics listed by this Circuit in *Melendez–Gonzalez* were fulfilled in this case. The area where the vehicle was stopped, its proximity to the border, the usual patterns of traffic in the area, information about recent illegal crossings, and the appearance of the vehicle (that it was riding low in the rear) all led the border patrol agents to a reasonable suspicion that illegal activity was occurring. Furthermore, we have held that a "hit" from a traffic sensor near an isolated area on the border when combined with other factors may lead to a reasonable suspicion of illegal activity. *See United States v. Gordon,* 712 F.2d 110, 113 (5th

Cir.1983); *United States v. Aguirre-Valenzuela,* 700 F.2d 161, 163 (5th Cir.1983).

The appellant argues that there are no facts in this case which distinguished his automobile and its activities from any other car being driven by the public generally. Lacking specific and directed suspicion, he urges that the requirements of an extended border search were not met. As authority, appellant relies upon *United States v. Frisbie,* 550 F.2d 335 (5th Cir.1977), in which we held that a particular stop was not justified. In *Frisbie,* however, there was no reasonable belief that criminal activity was afoot before the car was stopped.

The *Frisbie* court held that sensory hits and the time of day alone could not create a reasonable suspicion of criminal activity. The officers did not observe the presence of the other factors which might have given reasonable suspicion until *after* the vehicle had already been signaled to stop. In contrast, in the case before us, in addition to the sensory hits and the time of day, the agents ascertained that a border crossing had occurred, and they saw the car drive up, stop, and double back on itself. Further, they observed the condition of the vehicle before they decided to stop it.

We conclude that all three factors which are required for a search to qualify as an extended border search are met in this case.

**B.** *Probable Cause and the Automobile Exception.*

Another exception to the Fourth Amendment requirement of a warrant is the "automobile exception" first recognized by the Supreme Court in *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). There the Court held that an automobile could be searched for contraband without a warrant, provided the officers had probable cause to do so. *Carroll,* 267 U.S. at 155–56, 45 S.Ct. at 286.

The Court has stressed two justifications for the automobile exception. First, the mobility of an automobile creates a risk that if law enforcement officers are required to obtain a warrant after stopping it but before searching it, search can be avoided by the car being driven away while the warrant is sought. *South Dakota v. Opperman,* 428 U.S. 364, 367, 96 S.Ct. 3092, 3096, 49 L.Ed.2d 1000 (1976); *Cooper v. California,* 386 U.S. 58, 60–62, 87 S.Ct. 788, 790–91, 17 L.Ed.2d 730 (1967). In *United States v. Ross,* 456 U.S. 798, 806, 102 S.Ct. 2157, 2163, 72 L.Ed.2d 572 (1982) the Court made the point that "[g]iven the nature of an automobile in transit ... an immediate intrusion is necessary if police officers are to secure the illicit substance." We have explicitly held that "an automobile's mobility is an exigent circumstance permitting a search without warrant so long as there is probable cause. *United States v. Petty,* 601 F.2d 883, 890 (5th Cir.1979). A second reason justifying the automobile exception is that there is a lesser expectation of privacy in an automobile than in a home and its close or an office. *Cady v. Dombrowski,* 413 U.S. 433, 442, 93 S.Ct. 2523, 2528, 37 L.Ed.2d 706 (1973).

Addressing how extensive such a search can be, we have held that "police officers who have legitimately stopped an automobile and who have probable cause to believe the contraband is concealed somewhere within it may conduct a warrantless search of the automobile that is as thorough as a magistrate could authorize by warrant." *United States v. Mendoza,* 722 F.2d 96, 100 (5th Cir.1983); *quoting United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed. 2d 572 (1982). Hence, since the agents could search the automobile Gilbert drove they could also search the trunk.

The standard for probable cause for an automobile search is delineated in *United States v. Shaw,* 701 F.2d 367, 376 (5th Cir.1983), *cert. denied,* 465 U.S. 1067, 104 S.Ct. 1419, 79 L.Ed.2d 744 (1984). There we stressed that probable cause consists not of each individual datum of information being weighed but rather that the information should be considered as a "laminated total" and that it consists of a synthesis of what the police "have heard, what they know, and what they have observed as trained officers." *Id.* at 376, *quoting Smith v. United States,* 358 F.2d 833, 837 (D.C.Cir.1966), *cert. denied,* 386 U.S. 1008,

87 S.Ct. 1350, 18 L.Ed.2d 448 (1967). *See also, United States v. De Los Santos,* 810 F.2d 1326, 1336 (5th Cir.1987); *U.S. v. Tarango–Hinojos,* 791 F.2d 1174 (5th Cir. 1986); *United States v. Edwards,* 577 F.2d 883 (5th Cir.1978) (en banc), *cert. denied,* 439 U.S. 968, 99 S.Ct. 458, 58 L.Ed.2d 427 (1978).

■ The information given by the helicopter pilots to the ground agents created the reasonable belief the blue/gray Pontiac which Gilbert was driving contained either illegal aliens or contraband. Aside from the time, place, sensor hits, and evidence of foot traffic across the border, the agents also observed the car riding low in the back.

The initial stop, before any search, is justified by the standard of "reasonable articulable suspicion," a standard below that of probable cause. *United States v. Martinez,* 808 F.2d 1050, 1055 (5th Cir. 1987), *cert. denied,* 481 U.S. 1032, 107 S.Ct. 1962, 95 L.Ed.2d 533 (1987). This stop met that test. If it had not, any further information which was garnered after the stop could not have justified the search. "An observation made after and caused by a stop cannot be bootstrapped into grounds for reasonable suspicion warranting the stop." *United States v. Frisbie,* 550 F.2d 335, 338 (5th Cir.1977). *See also United States v. Cruz,* 581 F.2d 535, 539 (5th Cir. 1978), *overruled on other grounds, United States v. Causey* (en banc), 834 F.2d 1179 (5th Cir.1987). Given the fact, however, that the stop was proper because of reasonable suspicion, the border agent then properly talked with Gilbert, who lied about where he was coming from. The agent saw that Gilbert was very nervous and sweating profusely. He also saw the spare tire in the Pontiac's rear seat. If there was not already probable cause for search of the car, these facts, combined with the reasonable suspicion the agents already had, strengthened that suspicion into probable cause. *Martinez* at 1055; *United States v. Tarango–Hinojos,* 791 F.2d 1174 (5th Cir.1986).

Finally, the search of Gilbert's car might also have been justified by his consent. It is unnecessary for us to evaluate that justification, however. We need not consider the voluntariness of the consent—sometimes a difficult question. Here there are the two other independent justifications for the car search.

#### C. *Gilbert's Arrest.*

■ Appellant Gilbert Espinoza challenges the existence of probable cause for his arrest. Probable cause for arrest exists "when the facts and circumstances within the knowledge of the arresting officer and of which he has reasonably trustworthy information are sufficient in themselves to warrant in a person of reasonable caution the belief that an offense has been or is being committed." *United States v. Tarango–Hinojos,* 791 F.2d 1174, 1176 (5th Cir.1986), *citing United States v. Woolery,* 670 F.2d 513, 515 (5th Cir.1982), *cert. denied,* 459 U.S. 835, 103 S.Ct. 78, 74 L.Ed.2d 75 (1982). *See also United States v. Maldonado,* 735 F.2d 809, 815 (5th Cir.1984). Simply put, the same series of facts which constituted probable cause to stop the car and search it also constituted probable cause to arrest Gilbert.

#### II. *The Admission of the Confessions.*

Ernesto Espinoza argues that he was prejudiced by the admission of Gilbert's confession, and Lazarin argues that he was prejudiced by the admission of Ernesto's confession. In making this argument both defendants rely on *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

Every defendant has the right under the Sixth Amendment "to be confronted with the witnesses against him." *Bruton* holds that the right of confrontation is violated when several co-defendants are all tried jointly, one defendant's confession is used to implicate another defendant in the crime, and the confessor does not take the stand. The result is that the co-defendant cannot be cross examined by the non-confessing defendant. In this situation the Supreme Court has held that the co-defendants should be tried separately so that the demands of the confrontation clause can be

met. *See Cruz v. New York,* 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987); *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Further, the Supreme Court has held that if a confession *directly* implicates a co-defendant, the confession is so highly prejudicial that a curative instruction is not sufficient to obviate application of the *Bruton* rule. *Cruz v. New York,* 481 U.S. 186, 193, 107 S.Ct. 1714, 1719, 95 L.Ed.2d 162 (1987).

The defendants moved several times during the trial for severance, maintaining that the introduction of Gilbert and Ernesto's confessions was prejudicial against their co-defendants. The motions were denied in reliance upon our holding that *Bruton* is inapplicable unless the co-defendant's confession directly incriminates the non-confessing defendant without reference to other, admissible evidence. "A critical consideration in *Bruton* claims is whether the out of court statement at issue clearly implicates the co-defendant; if the statement does not do so, no serious *Bruton* issue is presented." *United States v. Basey,* 816 F.2d 980, 1005 (5th Cir.1987). "This Court has held consistently that the *Bruton* rule is not violated unless a co-defendant's statement directly alludes to the complaining defendant. (citations omitted). This is true, even if the evidence makes it apparent that the defendant was implicated by some indirect references." *United States v. Webster,* 734 F.2d 1048, 1054 n. 6 (5th Cir.1984), *cert. denied sub nom. Hoskins v. United States,* 469 U.S. 1073, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984). *See also United States v. Heffington,* 682 F.2d 1075, 1083 (5th Cir.1982), *cert. denied sub nom. Giella v. United States,* 459 U.S. 1108, 103 S.Ct. 734, 74 L.Ed.2d 957 (1983); *United States v. Castro,* 596 F.2d 674 (5th Cir.), *cert. denied,* 444 U.S. 963, 100 S.Ct. 448, 62 L.Ed.2d 375 (1979); *United States v. Stewart,* 579 F.2d 356, 359 (5th Cir.), *cert. denied,* 439 U.S. 936, 99 S.Ct. 332, 58 L.Ed.2d 332 (1978). To the same effect are the decisions of other Circuits. *See United States v. Wilkinson,* 754 F.2d 1427, 1435 (2nd Cir.), *cert. denied sub nom. Shipp v. United States* 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985); *United States v. Satterfield,* 743 F.2d 827, 849 (11th Cir. 1984), *cert. denied,* 471 U.S. 1117, 105 S.Ct. 2362, 86 L.Ed.2d 262 (1985); *United States v. Tavelman,* 650 F.2d 1133, 1139 (9th Cir. 1981), *cert. denied,* 455 U.S. 939, 102 S.Ct. 1429, 71 L.Ed.2d 649 (1982).

Gilbert's statement, standing alone, did not identify or implicate Ernesto. In Gilbert's confession, he said that he agreed to make a phone call and to then go to meet the man (not naming him) who was to help him in transporting and distributing the marihuana. Ernesto by his own arrival at the rendezvous and admissions implicated himself. Similarly, Lazarin was not identified either by name or any other characteristic in Ernesto's confession. Rather Ernesto said that he would take the Pontiac to a meeting place where some one else would pick it up. Lazarin then brought himself into the picture. It was Lazarin's actions rather than any identification of him in Ernesto's confession which raised suspicion of his participation in the conspiracy. Rather than making an identification in the past tense that the co-defendants were part of the conspiracy, both of the confessing defendants made predictions about future behavior on the part of their unnamed co-conspirators and the behavior implicated them.

Ernesto and Lazarin argue that *United States v. Pickett,* 746 F.2d 1129, 1132–33 (6th Cir.1984), *cert. denied,* 469 U.S. 1226, 105 S.Ct. 1222, 84 L.Ed.2d 362 (1985) supports their claim that their *Bruton* rights have been violated. That case is distinguishable, however, from the circumstances here. In *Pickett* the co-defendant's name was not used and the term "the individual" was inserted instead. The confession in *Pickett* clearly implicated the co-defendant, Polsgrove, without any other independent evidence; the jury could recognize the co-defendant directly from the redacted confession. Further, the government attorney, in closing argument, stated that "the individual" was "none other than the defendant, Don Polsgrove." *Id.* at 1132. In a similar case, *Hodges v. Rose,* 570 F.2d 643 (6th Cir.), *cert. denied sub nom. Lewis*

*v. Rose*, 436 U.S. 909, 98 S.Ct. 2243, 56 L.Ed.2d 408 (1978) a co-defendant's confession was admitted which referred to the non-confessing defendant but the court redacted his name from the confession and inserted a blank instead. Nevertheless, the confession standing by itself, without any additional evidence indicated to the jury whose name had filled the blank. *Id.* at 647. In both *Hodges* and *Pickett* the Sixth Circuit held that the admission of the redacted confessions directly implicated the non-confessing co-defendant and as such violated his *Bruton* rights.

The Supreme Court has reserved judgment on the issue raised in the Sixth Circuit cases, stating that "we express no opinion on the admissibility of a confession in which the defendant's name has been replaced with a symbol or neutral pronoun." *Richardson v. Marsh*, 481 U.S. 200, 211, 107 S.Ct. 1702, 1709 n. 5, 95 L.Ed.2d 176 (1987). But in any event *Hodges* and *Pickett* are inapplicable here because Gilbert's confession was not sufficient alone to implicate Ernesto; it took reference to outside actions and statements by Ernesto to implicate himself. Similarly, Lazarin's action of appearing at a rendezvous raised suspicion as to him—Ernesto's confession alone did not. The confessions were properly admitted.

### III. *The Voluntariness Claim.*

Ernesto claims that the trial court erred by failing to make a specific finding regarding whether his confession was made voluntarily. In *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) the Supreme Court held that a proper determination of voluntariness must be made by the trial judge out of the jury's presence before the disclosure of a confession to the jury. The principal concern of the Court was that if the jury found a confession involuntary an additional instruction to ignore its contents was futile, and the consideration of the confession destroyed a fair trial. This holding was later codified in 18 U.S.C. § 3501 which provides in subsection (a):

In any criminal prosecution brought by the United States or by the District of Columbia, a confession, as defined in subsection (e) hereof, shall be admissible in evidence if it is voluntarily given. Before such confession is received in evidence, the trial judge shall, out of the presence of the jury, determine any issue as to voluntariness. If the trial judge determines that the confession was voluntarily made it shall be admitted in evidence and the trial judge shall permit the jury to hear relevant evidence on the issue of voluntariness and shall instruct the jury to give such weight to the confession as the jury feels it deserves under all the circumstances.

 The statute does not require the trial court to hold a *Jackson v. Denno* hearing when the issue of voluntariness of a confession is not properly before it. *United States v. Gonzalez*, 548 F.2d 1185, 1190 (5th Cir.1977). *Gonzalez* requires not only that an objection to the introduction of a confession be raised, but also that it be made sufficiently clear to the court that a *Jackson v. Denno* hearing is being requested. *See also United States v. Moffett*, 522 F.2d 1379, 1380 (5th Cir.1975). Furthermore, if a defendant fails properly to challenge the introduction of his confession in court, he is precluded from later raising on appeal the absence of a *Jackson v. Denno* hearing as error. *See Gonzalez* at 1190; *Moffett* at 1380.

 Ernesto raised the issue of the admissibility of his confession only once during the entire course of the trial. When one of the arresting officers, Agent Garcia, was being questioned, the following colloquy took place:

Question: All right, and what did Mr. Ernesto Espinoza have to say about whether or not he knew about the load of marihuana?

Mr. Roberts: Your honor I would make an objection as to voluntariness.

The Court: The objection's overruled. Go ahead.

This objection was made in the middle of trial. It fell far short of notice to the court that a *Jackson v. Denno* hearing was requested. The defendant's attorney made

no motion to suppress Ernesto's confession prior to trial, never explained in any detail his casual objection "as to voluntariness," did not request a *Jackson v. Denno* hearing outside the presence of the jury, failed to cross-examine Agent Garcia regarding the voluntariness of the confession, never presented any evidence which raised a question regarding the voluntariness of Ernesto's confession, and did not argue that the confession was coerced or involuntary. No genuine issue of voluntariness was raised, and the trial court committed no reversible error in failing to hold a *Jackson v. Denno* hearing.[2]

Finally, even assuming that a *Jackson v. Denno* request had been properly made to the court, nevertheless, the finding of the district court would stand in this case. Before a prisoner is entitled to a hearing on the voluntariness of his confession the petitioner must "show that his version of the events, if true, would require the conclusion that his confession was involuntary." *Martinez v. Estelle*, 612 F.2d 173, 180 (5th Cir.1980) *citing to Procunier v. Atchley*, 400 U.S. 446, 451, 91 S.Ct. 485, 488, 27 L.Ed.2d 524 (1971). *See also United States v. Davidson*, 768 F.2d 1266 (11th Cir.1985). The defendant has not presented any competing version of the facts either at his trial or on appeal, much less any facts from which involuntariness of the confession could be inferred.

## IV. *The Sufficiency of the Evidence on Lazarin's Conspiracy Charge.*

Appellant Lazarin urges that the evidence was insufficient to support his conviction for conspiracy. When reviewing a challenge to the sufficiency of the evidence to support a conviction, we must decide whether a rational jury could find evidence which establishes guilt beyond a reasonable doubt. *United States v. Gardea–Carrasco*, 830 F.2d 41 (5th Cir.1987). It is not necessary that the evidence exclude every reasonable hypothesis of innocence. *United States v. Bell*, 678 F.2d 547 (5th Cir. Unit B June 1982) *aff'd on other grounds*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). But, there must be substantial evidence to uphold the verdict of the jury. *United States v. Malatesta*, 590 F.2d 1379, 1382 (5th Cir.1979), *cert. denied sub nom. Bertolotti v. United States*, 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777 (1979). Further, when reviewing the evidence all reasonable inferences and credibility choices must be viewed in the light most favorable to the government. *United States v. Nixon*, 816 F.2d 1022 (5th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 749, 98 L.Ed. 2d 762 (1988); *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). A jury may choose its verdict among reasonable constructions of the evidence so long as there is evidence to establish guilt beyond a reasonable doubt. *Nixon* at 1029; *United States v. Thomas*, 768 F.2d 611, 614 (5th Cir.1985).

■ In a conspiracy prosecution under 21 U.S.C. § 846, the government must prove beyond a reasonable doubt (1) the existence of an agreement between two or more persons to violate the narcotics laws, and that (2) each conspirator knew of the conspiracy, (3) intended to join it, and (4) did participate in the conspiracy. *United States v. Magee*, 821 F.2d 234, 238–39 (5th Cir.1987); *United States v. Natel*, 812 F.2d 937, 940 (5th Cir.1987). All four elements must be found to uphold a conspiracy conviction. Thus, proof of "mere knowing presence" is not sufficient to convict a person of participation in a conspiracy. *United States v. Robertson*, 659 F.2d 652, 656

**2.** The appellant argues that *Sims v. Georgia*, 385 U.S. 538, 87 S.Ct. 639, 17 L.Ed.2d 593 (1967) applies to this case. However that case is easily distinguished from the present one because:

defense counsel called the court's attention to the *Jackson v. Denno* ruling on this Court and stated that he did not "know whether the procedure being followed at this time satisfies the rule decided by the Supreme Court on June 22nd, 1964 that the Court must make

judicial determination whether the statement was made voluntarily before it is read to the jury."

*Id.* at 541–42, 87 S.Ct. at 641–42. In *Sims* the defense attorney raised the issue of the voluntariness of the confession. Furthermore, in that case it was alleged that the defendant had his confession beaten out of him. No such allegations were made in this case, and the issue was never properly raised.

(5th Cir.1981). Although each element of the conspiracy charge must be proved beyond a reasonable doubt, no element need be proved by direct evidence, but may be inferred from circumstantial evidence. An agreement may be inferred from "concert of action." *United States v. Vergara*, 687 F.2d 57, 61 (5th Cir.1982). Voluntary participation may be inferred from "a collocation of circumstances." *United States v. Marx*, 635 F.2d 436, 439 (5th Cir.1981); *United States v. Malatesta*, 590 F.2d 1379, 1381 (5th Cir.), *cert. denied sub nom. Bertolotti v. United States*, 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777 (1979). Knowledge may be inferred from "surrounding circumstances." *Vergara* at 61; *United States v. Arredondo–Morales*, 624 F.2d 681, 685 (5th Cir.1980).

■ In the case at hand, the entire government case against Lazarin consists of four undisputed facts: (1) After Ernesto made a phone call, and took the DEA agents over to La Rosita Cafe, Lazarin drove to the rendezvous with two other men in the car. (2) After Lazarin parked his car, an unidentified man got out of Lazarin's car and into the load car and drove it off quickly, eluding agents who attempted to stop him. (3) After Lazarin was arrested, the agents found a cellular/mobile phone in his car. (4) Lazarin had on his person approximately $1,700, roughly the same amount of money as Ernesto had.

There is no dispute that a conspiracy existed, because that has already been established through Ernesto and Gilbert's confessions. All of the four factual showings must go to the remaining three elements; whether Lazarin knew of the conspiracy, intended to join it, and participated in it. The question we must ask on review is whether the evidence stated above is sufficient for a rational jury to find knowledge, intent, and participation beyond a reasonable doubt.

Mere presence cannot establish either knowledge or participation in a conspiracy. In a case somewhat similar to Lazarin's, *United States v. Jackson*, 700 F.2d 181 (5th Cir.1983), *cert. denied sub nom.*, *Hicks v. United States*, 464 U.S. 842, 104 S.Ct. 139, 78 L.Ed.2d 132 (1983) one of the defendants, Talmadge Whitley, entered a restaurant in which the rest of the conspirators were located shortly after a phone call had been placed by one of the drug dealers to an unidentified outside associate. The content of the phone call was not introduced into evidence at the trial. Nor was the content of the call put in evidence in Lazarin's case. The plan was for some of the drug dealers to leave the restaurant to test the drugs which undercover agents were purporting to sell them, while others remained there to safeguard the money until after the purity of the drugs had been ascertained. While Whitley was in the restaurant he never spoke to any of the conspirators, although agents testified he was very "watchful" of comings and goings in the restaurant, constantly turning his head from left to right. *Jackson* at 184. The court found that "[a]t the most the evidence shows that Whitley associated with others who were involved in a conspiracy." *Id.* at 184. The evidence was found to be legally insufficient for a jury to infer, beyond a reasonable doubt, that Whitley knowingly and voluntarily participated in a conspiracy to possess cocaine with intent to distribute. "His conviction may not rest on mere conjecture and suspicion." *Id.* at 185–186.

While no case will reproduce the same pattern of facts as the case before us, three additional decisions of this Court do provide useful analogies. In both *United States v. Blessing*, 727 F.2d 353 (5th Cir. 1984), *cert. denied sub nom., Rodriguez v. United States*, 469 U.S. 1105, 105 S.Ct. 777, 83 L.Ed.2d 773 (1985) and *United States v. Gardea–Carrasco*, 830 F.2d 41 (5th Cir. 1987), a co-defendant was shown to have associated closely with a drug trafficker, and to have taken actions which a rational jury could have interpreted as advancing a conspiracy. In each case, however, we reversed the conviction.

In *Blessing* the defendant arrived in town with Treacy, who was attempting to purchase drugs from an undercover agent. Treacy had stated that he would arrive in

town with his "partner," (although he never specified Blessing as that partner). Blessing rented two vehicles with Treacy, a van and a car, which the government contended were to be used to transport the illegal drugs. Blessing, however, was never shown by the government to have participated in any of the negotiations for the sale of drugs, he never met the undercover agent, and he did not accompany Treacy to pick up the car which was used to transfer purchase money. Although evidence of a conspiracy and activities in furtherance of it could be inferred, we held that Treacy's knowledge of a conspiracy could not.

In *Gardea–Carrasco*, a defendant, Jesus, was shown to have been with the conspirators in a car which they drove while making arrangements furthering their drug trafficking, but he was never shown to have heard any of the conversations or participated in any of them. The principal organizer of the smuggling operation visited Jesus' house during the two days in which the operation was being planned, and Jesus helped carry suitcases containing the marihuana from a van at the airport to a private plane. These three facts combined together, however, were not held legally sufficient to prove that he had knowledge of the conspiracy.

An additional significant case is *United States v. Sneed*, 705 F.2d 745 (5th Cir. 1983). Martin Sneed Jr.'s father had previously been found guilty of deep involvement in an organization which imported 35,000 pounds of marihuana. Evidence was presented that Sneed Jr. was present in a house on the older Sneed's property in Orange, Texas, the day before the marihuana arrived, along with a crew of roughly 20 men who later helped unload the marihuana. The marihuana was stored in the house, and later one of the two Sneed sons helped load 1000 pounds of marihuana into a truck. There were two houses on the Sneed property, one of which one of Sneed's two sons either owned or lived in. It was unclear from testimony by the government witnesses, however, which son owned the house and helped load the marihuana. Because no evidence was presented that directly identified Sneed Jr. as the owner of the house or one of the loaders of the marihuana, we found that there was insufficient evidence to convict him of possession of marihuana. Mere presence during the activity was not enough.

Lazarin appeared at the rendezvous at the appointed time, as did Witley in *Jackson*, but with two companions. One of his companions drove the Pontiac away. A reasonable jury might have found that Lazarin participated in the conspiracy by transporting the unidentified Hispanic male who drove off the load car. But, as in *Jackson, Blessing,* and *Gardea–Carrasco*, no evidence was ever introduced from which a reasonable jury could find that Lazarin *knew* of the conspiracy.

The presence of the cellular telephone in Lazarin's car and the large amount of cash on his person may have convinced a reasonable jury to infer it more likely that Lazarin was a drug trafficker than if he had not had them with him. They could have decided that these are the "tools of the trade" for a drug trafficker. The applicable standard, however, is not one of "more likely than not"; the phone and cash do not prove Lazarin's knowledge of the conspiracy beyond a reasonable doubt.

We must hold that the four facts together are insufficient to prove Lazarin's knowledge of the conspiracy. Although no other explanations were offered by the defense, there was no burden of proof on Lazarin. It is possible, for example, that Lazarin was driving a friend over to the restaurant at the friend's request so the friend could "pick up a car," or for some other purpose. "Too many innocent scenarios jibe with the sparse record facts." *United States v. Gonzalez*, 703 F.2d 807, 808 (5th Cir.1983). We give the jury all deference in questions of credibility of testimony, but this is not a case where competing explanations are being offered. The question is simply whether the four undisputed circumstantial facts are sufficient to convict Lazarin of conspiracy beyond a reasonable doubt. It is not enough that the defendant merely associated with someone who was knowingly participating in a con-

spiracy nor is it enough that the evidence places the defendant in "a climate of activity that reeks of something foul." *United States v. Galvan*, 693 F.2d 417, 419 (5th Cir.1982). We conclude that the evidence in the record is not sufficient to prove beyond a reasonable doubt that Lazarin was guilty of conspiring with the Espinozas to possess marihuana with intent to distribute it.

In summary, we uphold both of Gilbert Espinoza–Seanez's convictions and Ernesto Espinoza–Seanez's conviction for conspiracy. We reverse Raul Lazarin–Becerra's conviction for conspiracy.

AFFIRMED IN PART AND REVERSED IN PART.

SNEED, Circuit Judge, concurring in part and dissenting in part:

I concur in Judge Williams' excellent opinion except with respect to its reversal of Raul Lazarin–Becerra's conviction for conspiracy. In my view a rational jury could find evidence which establishes the required intent beyond a reasonable doubt. The evidence in support of Lazarin–Becerra's conviction is stronger than that which exists in any of the four cases in which the majority relies. *See United States v. Gardea Carrasco*, 830 F.2d 41 (5th Cir.1987); *United States v. Blessing*, 727 F.2d 353 (5th Cir.1984), *cert. denied*, 469 U.S. 1105, 105 S.Ct. 777, 83 L.Ed.2d 773 (1985); *United States v. Sneed*, 705 F.2d 745 (5th Cir. 1983); *United States v. Jackson*, 700 F.2d 181 (5th Cir.), *cert. denied*, 464 U.S. 842, 104 S.Ct. 139, 78 L.Ed.2d 132 (1983).

Of these four authorities, *United States v. Blessing, supra*, is the most closely in point. Blessing's connection with the conspiracy was sufficiently ambiguous to preclude the finding by a rational jury that he "had the deliberate, knowing, and specific intent to join the conspiracy." 727 F.2d at 356 (quoting *United States v. Gordon*, 712 F.2d 110, 114 (5th Cir.1983)).

This case is quite different. Here Lazarin–Becerra appeared following Ernesto's phone call at a time sufficiently proximate to the call to permit the inference that it was in response to it. Ernesto's call very likely was to his confederate because the fruits of his cooperation with the agents depended upon his producing that individual. Lazarin–Becerra parked his car "several yards" from the Pontiac. Immediately one of his two passengers got into the Pontiac and drove it away. Lazarin–Becerra and the other passengers were arrested. Probable cause to arrest unquestionably existed. Thereafter, it was found that Lazarin–Becerra had a mobile telephone in his car and an amount of cash roughly equal to that found on Ernesto. This suggests the usual practice where two buyers are involved, not wholly unlike those situations in which a check is made payable to co-payees.

It is true that Lazarin–Becerra did not step from his car immediately upon parking, get into the Pontiac, and drive it away. The individual who did so, had he been apprehended, would no doubt argue that he too lacked the required intent to join the conspiracy. I believe this court would not sustain the argument. Should this be true, the majority appears to hold that the failure of Lazarin–Becerra to drive the car away creates a sufficient possibility that he was an innocent chauffeur of a conspirator to preclude a finding beyond a reasonable doubt that Lazarin–Becerra had the required intent. I cannot agree.

I say this in full realization that a conspiracy conviction in drug prosecutions should not be made easy to obtain. Not everyone standing around the edges of the proscribed transaction are conspirators. On the other hand, the circle into which conspirators must fall should not be so small as to include only those who physically handled the controlled substance with a manifested intent to sell and those who hold cash with a manifested intent to buy. While this case does not place this circuit in that position, it is a step in that direction. It is a step I would not take.